**Reversed and Remanded and Opinion filed April 24, 2012.**



In The

# Fourteenth Court of Appeals

_____

### NO. 14-11-00704-CV
_____

**THE UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON,**
**Appellant**

**V.**

**KAI HUI QI, Appellee**

---

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 11-CV-0043**

---

## OPINION

This case involves a Medical Liability Act claim for damages arising from allegedly negligent health care treatment. Appellant, The University of Texas Medical Branch at Galveston ("UTMBG"), brings an interlocutory appeal from the trial court's order denying appellant's motion to dismiss based on the asserted inadequacy of appellee Kai Hui Qi's expert report. We conclude that appellee's expert report is not adequate because

appellee's expert failed to specify whether the standards of care apply to the doctor or the nurse; alternatively, appellee's expert failed to specify whether there are general standards of care that apply to both doctors and nurses. We have also identified additional deficiencies which are described below. Accordingly, we reverse and remand to the trial court for further proceedings to include determination of whether to grant a 30-day extension to cure the deficiencies.

## BACKGROUND

Kai Hui Qi sued UTMBG, contending certain employees were negligent in providing medical care, and their negligence resulted in the death of Qi's unborn child. Specifically, Qi alleges that Virginia Rauth, M.D., and Julie Griffice, R.N., were negligent in providing medical care to Qi when they failed to diagnose preeclampsia and failed to admit Qi to the hospital for treatment and observation. Because the suit concerns a health care liability claim, Qi filed an expert report and curriculum vitae of Dr. Aaron Caughey, M.D., Ph.D. *See* Tex. Civ. Prac. & Rem. Code § 74.351. UTMBG filed its objections to Qi's expert report along with a motion to dismiss with prejudice. Qi filed a response to UTMBG's objections and motion to dismiss. After a hearing, the court denied UTMBG's motion to dismiss. UTMBG timely filed notice regarding this interlocutory appeal.

## ANALYSIS

On appeal, UTMBG argues that Qi's expert report is inadequate because the author: (1) failed to identify a standard of care violated by UTMBG directly, or, alternatively, failed to identify standards of care violated by Dr. Rauth and Nurse Griffice that would give rise to vicarious liability; (2) failed to address Qi's cause of action alleging negligent use of "blood pressure cuffs/testing equipment and urine testing strips"; (3) failed to identify a standard of care violated by UTMBG regarding Qi's claim that UTMBG did not counsel Qi on the possibility of preeclampsia and the symptoms to watch for; (4) failed to identify a standard of care violated by UTMBG, Rauth, or Griffice, with respect to the failure to diagnose preeclampsia and the failure to admit Qi for elevated blood pressure;

2

and (5) failed to address Qi's "catchall" claims of negligence in deviating from the standard of care for the treatment of high blood pressure and preeclampsia, and failing to refer Qi to a specialist or consult with a specialist concerning Qi's condition.

Section 74.351 of the Texas Civil Practice and Remedies Code requires a healthcare liability claimant to serve each party with one or more expert reports along with the curriculum vitae of each expert making the report. Tex. Civ. Prac. & Rem. Code § 74.351(a). The expert report must provide a "fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). Under section 74.351(l), a trial court shall grant a motion challenging the adequacy of an expert report only if the report does not represent an objective, good-faith effort to comply with the definition of an expert report provided in section 74.351(r)(6). *Id.* § 74.351(l), (r)(6). If an expert report has not been served within the period specified by section 74.351(a) because elements of the report are found deficient, the trial court may grant one 30-day extension to the claimant in order to cure the deficiency. *Id.* § 74.351(c).

We review the trial court's determination of the adequacy of an expert report for an abuse of discretion. *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 185 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). In making its determination on whether the report represents a good-faith effort to comply with the statute, the trial court is limited to the information found within the four corners of the report. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). To constitute a good-faith effort, the report must provide enough information to: (1) inform the defendant of the specific conduct the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011) (citing *Palacios*, 46 S.W.3d at 879). No particular words or formality are required, but bare conclusions will not suffice. *Id.* A plaintiff need not marshal all the plaintiff's

3

proof or present evidence in the report as if it were actually litigating the merits. *Palacios*, 46 S.W.3d at 878–79. However, the report must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *Scoresby*, 346 S.W.3d at 555–56; *Walgreen*, 243 S.W.3d at 185–86. A report that merely states the expert's conclusions about those three elements does not constitute a good-faith effort. *Palacios*, 46 S.W.3d at 879.

Identifying the standard of care is critical. Whether the standard was violated cannot be determined absent specific information about what the defendant should have done differently. *Id.* at 880. Though the "fair summary" of the expert's opinions required by the expert report is something less than a full statement of the applicable standard of care and how that standard was breached, the report must still set out what care was expected, but not given. *Id.*; *see also* Tex. Civ. Prac. & Rem. Code § 74.351(r)(6).

UTMBG does not challenge Dr. Caughey's qualifications. Instead, in five issues UTMBG contends Dr. Caughey failed to address certain of Qi's claims and failed to describe a standard of care that was violated for certain claims. The relevant portion of Dr. Caughey's six-page report is reproduced here:

**Case Summary**

Kai Hui Qi was a 33 year old . . . woman at least 26 weeks gestation who presented with severe preeclampsia, vaginal bleeding, and an intrauterine fetal demise on January 19, 2009 to the [UTMBG] labor and delivery unit. . . .

Prior to January 12th, 2009, Ms. Qi had several prenatal visits. Notably, her blood pressure ranged from 94/60 to 118/70 and she was always protein negative on the urine dipstick test. On January 12th, 2009, Ms. Qi presented with a blood pressure of 146/83, an interval 8 pound weight gain, and a urine dipstick test which returned trace. The note that day signed by Dr. Virginia Rauth and Julie Griffice, RN makes no comment about the elevated blood pressure, no comment about having asked Ms. Qi about the symptoms of preeclampsia, or having rechecked the blood pressure.

4

On January 18, 2009, Ms. Qi or her husband called into the labor and delivery triage at 11:19 AM to complain of painless bright red vaginal bleeding. In the note signed by Nancy Jahn, RN, it is noted that the patient had a blood pressure of 140/90 the day prior and that she was currently feeling fetal movement. The patient was advised by Nurse Jahn to drive into labor and delivery. Of note, per patient report, she had checked the blood pressure the day before on a machine in a store not in a health care setting.

On January 19, 2009, Ms. Qi presented in the afternoon with the complaint of vaginal bleeding, headache, and an elevated blood pressure of 149/90. In triage, she had a blood pressure of 148/101 and was noted to have an intrauterine fetal demise and oligo/anhydramnios. A plan was made . . . to admit the patient for induction of labor. Laboratory tests on admission included an hematocrit of 22.4 . . . [and] urine dipstick of trace . . . . Her induction progressed reasonably and she delivered a stillborn infant on January 20, 2009.

. . . .

**Standard of Care**

In this case, I believe there are three potential care interactions to discuss: 1) the visit on January 12, 2009; 2) the triage call on January 18, 2009; and 3) the care of Ms. Qi during her admission beginning on January 19, 2009.

1) With regards to her clinic visit on January 12, 2009, I believe the standard of care was violated by the clinicians who saw her that day. Firstly, it is unclear how well the clinicians communicated the issue of an elevated blood pressure to Ms. Qi or whether interpretive services were utilized. In a woman who has previously been entirely normotensive and aproteinuric, a blood pressure with a systolic blood pressure of 140 or greater or a diastolic blood pressure of 90 or greater deserves further work-up. A standard work-up in that setting would have been serial blood pressures, a 24-hour urine collection, and laboratory tests, and if any of these were persistently positive, a fetal ultrasound to screen for intrauterine growth restriction. It is difficult to determine exactly what any of these tests would have returned because they weren't sent that day, but given that Ms. Qi continued to have elevated blood pressures when she checked them herself and when she presented a week later, it does seem more likely than not that her serial blood pressures would have been elevated.

5

Further, when counseling a woman who might be developing preeclampsia, three symptoms, headache, abdominal pain, and visual changes are always discussed with the patient and they are told to return to the hospital with any of those symptoms. Given that Ms. Qi developed such symptoms on January 18, 2009, I believe it is more likely than not that she would have known to return on that date when those symptoms occurred. Given the significant language barrier that would have been recognized by Dr. Rauth and Nurse Girffice [sic], it would have been imperative to ensure that these risks/symptoms were appropriately communicated and understood by Ms. Qi. However, given that the majority of her labs were normal on January 19, 2009, I believe that these same labs would have been normal on January 12, 2009. The two exceptions are her hematocrit and urine protein. The hematocrit was quite low when she presented on January 19, 2009. I think the severity of this fall in hematocrit was due, at least in part, to her placental abruption, so I believe that the hematocrit would have been higher on January 12, 2009. Finally, given that the urine was trace positive, it is more likely than not that a 24 hour urine collection would have been 300 mgs. or greater.

Given that it is more likely than not she would have been diagnosed with preeclampsia and almost certainly with gestational hypertension, a fetal ultrasound would have been ordered. I believe that such an ultrasound would have likely demonstrated the oligohydramnios and more likely than not would have demonstrated intrauterine growth restriction. Given these findings, I believe this would have prompted a hospital admission for Ms. Qi and a course of betamethasone. Given the fact that she eventually experienced a stillbirth due to placental abruption, it is likely that at some point during this hospitalization, the fetal heart tracing would have become nonreassuring prompting delivery. If such a delivery occurred it would have been of a 25-26 week gestational age fetus whose mortality rate would have been less than 50%, meaning that the fetus would have survived more likely than not.

2) When Ms. Qi or her husband called in to UTMB triage on January 18, 2009 with vaginal bleeding, a recent[ly] elevated blood pressure, and potentially complaining of a headache, the triage nurse should have told her to come to labor and delivery. In the note signed the same day by Nurse Jahn, it clearly states that she communicated that Ms. Qi should come to labor and delivery immediately. I believe that due to the . . . significant language barrier, unfortunately, there was a failure to understand this advice by . . . Mr. and Mrs. Qi that led to a delay [of] 24 hours of her presentation to labor and delivery.

6

3) When Ms. Qi presented to labor and delivery on January 19, 2009, it appears that she was evaluated promptly, a clear differential diagnosis was made, and a plan well within the standard of care was created. The care provided by Dr. Harirah and the team of residents and nurses appears exemplary.

**Causality**

In this case, there are competing pathways in causality – the pathophysiology that led to the placental abruption and stillbirth and the disruption of standard of care that increased the probability of this occurring. In terms of the natural history: 1) Ms. Qi developed preeclampsia; 2) the preeclampsia likely caused the placental abruption; and 3) the placental abruption caused the intrauterine fetal demise. However, there was at least one opportunity to disrupt that causal pathway.

If Ms. Qi had been diagnosed appropriately with gestational hypertension and preeclampsia on January 12, 2009, then as delineated above, the intrauterine fetal demise could have been prevented by earlier delivery and, if delivered, the infant would have survived, more likely than not. Further, if Ms. Qi had been diagnosed, she would have been treated with bedrest and with antihypertensive agents if her blood pressures were severely elevated. There is evidence to suggest that bedrest in the setting of preeclampsia is associated with a prolongation of the pregnancy. The same is true with controlling blood pressures in the setting of preeclampsia.

**Conclusion**

Thus, the clinicians who saw Ms. Qi on January 12, 2009 violated the standard of care by not further evaluating her for gestational hypertension / preeclampsia [or] communicating the importance of preeclampsia signs and symptoms to a woman with elevated blood pressure. Because of this, Ms. Qi lost an opportunity to prevent the subsequent intrauterine fetal demise.

## I. Alleged failure to address liability

In its first issue, UTMBG argues that Dr. Caughey identifies UTMBG by name only twice, does not state a hospital standard of care that was applicable to UTMBG, and does not state facts sufficient to demonstrate that UTMBG would be vicariously liable for violations of the standards of care by Dr. Rauth or Nurse Griffice. UTMBG further contends that, even presuming that UTMBG's liability is based upon vicarious liability for

the conduct of Dr. Rauth or Nurse Griffice, the report still fails to identify a physician's standard of care violated by Dr. Rauth or a nurse's standard of care violated by Nurse Griffice.

## A. Vicarious liability alleged against UTMBG

Dr. Caughey's expert report was not required to name UTMBG specifically or identify a hospital standard of care breached by UTMBG, so long as UTMBG's liability is based entirely upon the actions of its resident physicians and nurses.[1] *See Univ. of Tex. Sw. Med. Ctr. v. Dale*, 188 S.W.3d 877, 879 (Tex. App.—Dallas 2006, no pet.) (holding that expert report did not need to name UT Southwestern because the claims against UT Southwestern were based entirely upon the actions of its physicians, and there was no allegation that UT Southwestern was directly negligent); *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) ("When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient."). Because Qi is not alleging that UTMBG is directly liable, Dr. Caughey's expert report was not required to mention UTMBG by name. *See Dale*, 188 S.W.3d at 879.

## B. Standard of care for each defendant

UTMBG argues that Dr. Caughey was required to either affirmatively state that the same standard of care applied to both Dr. Rauth and Nurse Griffice, or was required to describe the respective standards of care for a nurse and a doctor in the same situation.[2]

---

[1] Plaintiff's Original Petition states that both individual defendants were employees of UTMBG.

[2] *See Hayes v. Carroll*, 314 S.W.3d 494, 506 (Tex. App.—Austin 2010, no pet.) ("Because the report affirmatively states that a uniform standard of care applies to each physician and nurse, and identifies what the standard of care is, [the] report is sufficient to provide a fair summary to each physician and nurse of his opinion regarding the standard of care applicable to each."); *Polone v. Shearer*, 287 S.W.3d 229, 235 (Tex. App.—Fort Worth 2009, no pet.) ("Because the report does not delineate between the standard of care applicable to a physician's assistant and the standard of care applicable to a physician, the report sets forth but one standard of care . . . [and] [b]ecause the report does not articulate that the standards of care are the same, the report required the trial court to impermissibly infer that [the physician's assistant and doctor] shared identical standards of care . . . which may or may not be correct . . . ."); *Rittger v. Danos*, 332 S.W.3d

8

Dr. Caughey's expert report stated that "[Caughey] believe[d] the standard of care was violated by the *clinicians* who saw [Qi] that day." (Emphasis added). We hold Dr. Caughey did not sufficiently describe the standard of care applicable to, and breached by, each defendant.[3] Nor did Dr. Caughey explicitly state that the same standard of care applies to both Dr. Rauth and Nurse Griffice. Accordingly, we sustain UTMBG's first issue.

## II. Alleged failure to identify standard of care as to specific criticisms

In its third and fourth issues, UTMBG argues that Dr. Caughey's expert report failed to identify a standard of care that was violated with regard to specific theories of liability, including allegedly failing to communicate with and diagnose Qi.

Specifically, in its third issue, UTMBG argues that Dr. Caughey's expert report failed to identify a standard of care that was violated by Dr. Rauth and Nurse Griffice in failing to communicate to Qi the "possibility of developing preeclampsia and the symptoms to watch for." Dr. Caughey's expert report states that:

> [I]t is unclear how well the clinicians communicated the issue of an elevated blood pressure to Ms. Qi or whether interpretive services were utilized. . . . [W]hen counseling a woman who might be developing preeclampsia, three symptoms[—]headache, abdominal pain, and visual changes[—]are always discussed with the patient and they are told to return to the hospital with any of those symptoms. . . . Given the significant language barrier that would have been recognized by Dr. Rauth and Nurse Girffice [sic], it would have been imperative to ensure that these risks/symptoms were appropriately communicated and understood by Ms. Qi.

Dr. Caughey's report further reveals that "[t]he note . . . signed by Dr. Virginia Rauth and Julie Griffice, RN makes . . . no comment about having asked Ms. Qi about the

550, 556 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("Appellees are not required to specifically state the same standard of care for each individual physician practicing on the same patient when each physician owes the same duties to the patient.").

[3] *See Polone*, 287 S.W.3d at 234 ("Just as an expert report must provide an explanation of how each defendant specifically breached the standard of care, the expert report must set forth the applicable standard of care for each defendant.").

symptoms of preeclampsia . . . ." The report notes that the standard of care was to ensure that the risks and symptoms of preeclampsia were communicated to Qi, especially where there was a significant language barrier. The report states that the medical records fail to note such counseling.

In his report, Dr. Caughey describes a standard of care for communication of the risks and symptoms to the patient.[4] However, Dr. Caughey failed to specify whether the standard of care applied to Dr. Rauth, Nurse Griffice, or both. Accordingly, we sustain UTMBG's third issue.

In its fourth issue, UTMBG argues that Dr. Caughey failed to identify a standard of care that was violated with regard to the theories of liability that Dr. Rauth and Nurse Griffice were negligent in failing to diagnose preeclampsia and failing to admit Qi to the hospital for elevated blood pressure. We again conclude that Dr. Caughey did not sufficiently identify whether the standard of care applies to Dr. Rauth or Nurse Griffice, or whether it was a general standard that applied to both.

In addition, UTMBG argues that the relevant statements and opinions in Dr. Caughey's report were "all speculation and unsubstantiated conclusions." In his report, Dr. Caughey notes that when Qi visited the hospital on January 12, 2009, her blood pressure was 146/83, she had an 8 pound weight gain since her previous visit, and a urine dipstick test "returned trace." Over the course of previous prenatal visits, Qi's blood pressure ranged from 94/60 to 118/70. As noted previously, Dr. Caughey stated that either a systolic blood pressure of 140 or greater or a diastolic blood pressure of 90 or greater "deserves further work-up." Dr. Caughey described what a further work-up would entail, and opined: "given that Ms. Qi continued to have elevated blood pressures when she checked them herself and when she presented a week later, it does seem more likely than

---

[4] Though not clearly challenged by UTMBG, the causation element of this claim is not specifically addressed under the "Causality" section of Dr. Caughey's report. It is not clear that Qi developed any of the symptoms—a headache, abdominal pain, or visual changes—and failed to return to the hospital once those symptoms manifested.

10

not that her serial blood pressures would have been elevated." Dr. Caughey further notes that "[g]iven that it is more likely than not [Qi] would have been diagnosed with preeclampsia and almost certainly with gestational hypertension, a fetal ultrasound would have been ordered." Dr. Caughey also opines that the ultrasound would have demonstrated intrauterine growth restriction, which would have "prompted a hospital admission for Ms. Qi." Dr. Caughey concludes this portion of the report by stating that if Qi had been diagnosed with preeclampsia and hospitalized, it is likely that delivery would have been induced and the "fetus would have survived more likely than not." We conclude that the relevant statements and opinions in Dr. Caughey's report are not all speculation and unsubstantiated conclusions.

Accordingly, we sustain UTMBG's fourth issue only as to Dr. Caughey's failure to describe the standard of care respectively for doctors and nurses and overrule the remainder of this issue.

## III. Alleged failure to address specific acts of negligence raised in pleadings

UTMBG's second and fifth issues concern the alleged failure of Dr. Caughey's expert report to address certain claims raised in Qi's pleadings.

In its second issue, UTMBG argues that Dr. Caughey's expert report wholly fails to identify the standard of care, breach, and causality related to Qi's claim that Dr. Rauth and Nurse Griffice negligently used "blood pressure cuffs/testing equipment and urine testing strips." In its fifth issue, UTMBG argues that Dr. Caughey's expert report wholly fails to address the claims raised in Qi's pleadings that Dr. Rauth and Nurse Griffice were negligent and proximately caused Qi's injuries by: (1) deviating from the standard of care for the treatment of high blood pressure and preeclampsia, and (2) failing to refer Qi to a specialist or a physician qualified to confirm diagnosis and treat Qi, or failing to consult with such a specialist regarding Qi's condition.

11

We agree with UTMBG, and conclude that Dr. Caughey failed to address the applicable standards of care, breach, and causality related to these claims. However, we note that all of the claims asserted by Qi fall within the same cause of action. *See Certified EMS, Inc. v. Potts*, 355 S.W.3d 683, 691–92 (Tex. App.—Houston [1st Dist.] 2011, pet. granted) (noting that the expert report is required to address each "cause of action," which refers not to a specific claim, but rather a "group of operative facts giving rise to one or more bases for suing."). An expert is not required to address each and every act or omission mentioned in the pleadings, so long as at least one liability theory within each cause of action is sufficiently addressed. *Lopez v. Brown*, 356 S.W.3d 599, 604–05 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Potts*, 355 S.W.3d at 691–94, 700. Therefore, Dr. Caughey's failure to address all the acts or omissions alleged in the petition is not by itself a failure to comply with section 74.351 that would justify a dismissal of Qi's health care liability claim. *See Lopez*, 356 S.W.3d at 604–05. Accordingly, we overrule UTMBG's second and fifth issues.

## CONCLUSION

Because Dr. Caughey did not sufficiently describe or specify whether the standards of care breached by the "clinicians" applied to Dr. Rauth, Nurse Griffice, or both, and because we may not infer an answer, we hold Dr. Caughey's report is inadequate. We remand to the trial court for further proceedings, including determination of whether to grant Qi a thirty-day extension to cure the deficiencies in the expert report. *See* Tex. Civ. Prac. & Rem. Code § 74.351(c).


/s/     Martha Hill Jamison
        Justice


Panel consists of Justices Frost, Seymore, and Jamison.

12