**Orders in Cause No. 14-11-00932-CV and Cause No. 14-11-00943-CV Affirmed, Order in Cause No. 14-11-00997-CV, Reversed and Remanded, and Memorandum Opinion filed July 12, 2012.**



In The

# Fourteenth Court of Appeals

_____

NO. 14-11-00932-CV
NO. 14-11-00943-CV
NO. 14-11-00997-CV

_____

**ST. LUKE'S SUGAR LAND HOSPITAL, ANDREW PSYK, M.D., AND JEMALATHA VIJAYAN, M.D., Appellants**

**V.**

**PAUL JOSEPH, Appellee**

**On Appeal from the 434th District Court
Fort Bend County, Texas
Trial Court Cause No. 11-DCV-188962**

# MEMORANDUM OPINION

These appeals all stem from the same healthcare liability case governed by Chapter 74 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507 (West 2011 & Supp. 2011). Appellee, Paul Joseph, filed suit against appellants, St. Luke's Sugar Land Hospital ("St. Luke's"), Andrew Psyk, M.D., and

Jemalatha Vijayan, M.D. for medical malpractice.[1]  Appellee filed a single medical expert report in accordance with section 74.351(a) of the Texas Civil Practice and Remedies Code.  *See id.* § 74.351(a).  Appellants each filed objections to appellee's expert report and moved to dismiss his lawsuit.  *See id.* § 74.351(b).  Appellee filed a response contending his expert report was adequate and he also moved for a thirty-day extension of time to file an amended report as allowed by section 74.351(c).  *See id.* § 74.351(c).  The trial court denied appellants' motions and as a result, did not reach appellee's motion for an extension of time to file an amended report.  Each appellant filed separate interlocutory appeals contending the trial court abused its discretion when it denied their motions to dismiss.[2]  We consolidated these appeals on the Court's own motion.  We affirm the trial court's orders denying the motions of Dr. Psyk and St. Luke's.  We reverse the trial court's order denying Dr. Vijayan's motion and remand to the trial court for consideration of appellee's request for a thirty-day extension of time under section 74.351(c) to cure the deficiency in Dr. Murphy's expert report as to Dr. Vijayan.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2009, appellee was 57 years old and had a history of hypertension.[3]  At about 11:00 p.m. on April 4, 2009, appellee began experiencing substernal chest pain. Appellee called 9-1-1 and paramedics arrived at his home and immediately transported him to the Emergency Room ("ER") at St. Luke's.  At 11:27 p.m., while in route to the hospital, a 12-lead electrocardiogram ("ECG") was taken by the paramedics.  The ECG revealed: "Abnormal ECG," "ACUTE MI SUSPECTED" and "ST elevation consider anterior injury or acute infarct."  The paramedics diagnosed appellee with an acute myocardial infarction and administered aspirin and nitroglycerin.

---

[1] Appellee also filed suit against Andres Mesa, M.D.  Dr. Mesa is not a party to these appeals.

[2] St. Luke's appeal is Cause No. 14-11-00932-CV; Dr. Psyk's appeal is Cause No. 14-11-00943-CV; and Dr. Vijayan's appeal is in Cause No. 14-11-00997-CV.

[3] The facts are taken from the report of Dr. Franklin L. Murphy, appellee's medical expert.

2

Appellee arrived at the ER triage area at 11:56 p.m. and the initial nurse assessment noted 6/10 midsternal chest pain and sharp left upper back pain. Dr. Psyk was the attending ER physician that evening. The initial assessment, made at 12:02 a.m., revealed ongoing chest pain, with radiation into the patient's left arm. Appellee was given sublingual nitroglycerin ("NTG"), which resulted in a slight diminution of the chest pain he was experiencing. Another ECG was performed at 12:03 a.m. ("ECG 1") and the results read: "ST segment elevation, consider anterior injury or acute infarct *** ACUTE MI ***." Dr. Psyk immediately reviewed the results of ECG 1 and when asked by the nursing staff if he wanted to activate the STEMI protocol, Dr. Psyk declined because he wanted to speak to the on-call interventional cardiologist first.[4] At 12:29 a.m., Dr. Psyk spoke on the telephone with Dr. Mesa, the on-call attending cardiologist. At about 12:36 a.m., another ECG was obtained ("ECG 2"). The results of ECG 2 read: "ST segment elevation, consider anterior injury or acute infarct *** ACUTE MI ***." The results of ECG 2 were immediately given to Dr. Psyk and he was again asked by the nursing staff if he wished to activate the STEMI protocol. Dr. Psyk once again declined and instead decided that appellee should be admitted to the ICU as chest pain, unstable angina. At 12:40 a.m., the ECG was faxed to Dr. Mesa. Laboratory tests run at 12:41 a.m. on initial cardiac enzymes showed that appellee had elevated CK-MB of 9.8 (nl 0-4.9).

Appellee continued to complain of chest pain and he became hypotensive, which prompted Dr. Psyk to give him two 500cc's bolus of normal saline. At an undetermined time between 12:41 a.m. and 3:15 a.m., appellee's "case was discussed with Dr. Vijayan/Treistman on call MD and [appellee] subsequently moved to room 204 in the ICU with continued chest pain."[5] At 3:15 a.m., Dr. Vijayan started Dopamine for blood pressure support. At 5:45 a.m., Dr. Treistman ordered that St. Luke's cath lab be activated. Appellee was taken to the cath lab and the procedure was started. As a result

---

[4] In his report, Dr. Murphy defined STEMI as an acronym that stands for ST Elevation Myocardial Infarction.

[5] All quoted information in this section is from Dr. Franklin's report.

3

of the procedure, the doctors determined that appellee had a "100% LAD occlusion and PTCA eventually performed at 8:06 a.m. restoring TIMI 2-3 flow to distal LAD." Appellee also "required an intraaortic balloon pump placed for cardiac support as well as a pacer for complete heart block." By the time these procedures were performed, appellee had already suffered "significant cardiac damage," which was confirmed by the results of "an ECG obtained at 2:48 a.m. showing continued evolution of the MI with Q waves V1-V6 and RBBB."

Following the procedures, appellee was eventually transferred to St. Luke's Episcopal Hospital where he experienced "a long protracted course incurring ARDS and necessitating a prolonged course of ventilation." An echocardiogram obtained at St. Luke's Episcopal Hospital "confirmed severely depressed LV dysfunction as a direct result of myocardial infarction."

On April 1, 2011, appellee filed suit against appellants as well as Dr. Mesa. Appellee alleged that the three doctor defendants were negligent in handling his medical care when he arrived at St. Luke's in April 2009. Appellee also alleged that St. Luke's was vicariously liable for the acts and omissions of its employees and agents.

Attempting to comply with section 74.351 of the Texas Civil Practice and Remedies Code, appellee filed and served the expert report and curriculum vitae of a single expert: Dr. Franklin L. Murphy, a board certified cardiologist licensed to practice in New Mexico and California. In his report, Dr. Murphy addressed the standard of care required of each doctor defendant, how each defendant breached that standard of care, and how those breaches caused appellee's condition to worsen, eventually leading to a complete blockage of blood flow to his heart. In response, the defendants, arguing Dr. Murphy's report was deficient, filed objections and moved the trial court to dismiss appellee's lawsuit. Following a hearing, the trial court denied the defendants' motions in separate orders.

DISCUSSION

Appellants separately filed interlocutory appeals contending the trial court abused its discretion when it denied their motions to dismiss. Because they arise out of the same facts and lawsuit, we have consolidated the appeals .

## I.      The Standard of Review and Applicable Law

We review a trial court's ruling on the adequacy of an expert report under an abuse-of-discretion standard. *Estate of Regis ex rel. McWashington v. Harris Cnty. Hosp. Dist.*, 208 S.W.3d 64, 67 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.). We may not reverse a trial court's discretionary ruling simply because we might have decided it differently. *Id.*

Section 74.351 of the Texas Civil Practice and Remedies Code requires a healthcare liability claimant to serve each party with one or more expert reports along with the curriculum vitae of each expert making the report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). Under the statute, the expert report must provide a fair summary of the expert's opinions regarding the applicable standards of care, the manner in which the care rendered by the defendant physician or healthcare provider failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* at §74.351(r)(6). Generally, if a healthcare liability plaintiff does not serve the required expert report within the statutory deadline, the trial court must dismiss the lawsuit with prejudice. *Gannon v. Wyche*, 321 S.W.3d 881, 885 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)). If the healthcare liability plaintiff served a report within the statutory deadline, the trial court cannot dismiss the lawsuit unless the report does not represent an objective good-faith effort to comply with the statutory requirements for such a report. *Id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l)). "If an expert report has not been timely 'served'

5

because 'elements of the report are found deficient,' the court may grant one thirty-day extension to the plaintiff to cure the deficiency." *Id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c)).

When making the determination as to whether the healthcare liability plaintiff's expert report represents a good-faith effort to comply with the statute, the trial court is limited to the information found within the four corners of the expert report and curriculum vitae. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). In setting out the expert's opinions on each of the required statutory elements, the report, to qualify as a good-faith effort to comply with the statute, must only provide enough information to fulfill two purposes: (1) the report must inform the defendants of the specific conduct the plaintiff has called into question; and (2) the report must provide a basis for the trial court to conclude the claims have merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011). No particular words or formality are required, but bare conclusions will not suffice. *Id.* The report must address all of the statutory elements and omissions cannot be supplied by inference. *Id.*

An expert report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *Palacios*, 46 S.W.3d at 878. In setting out the expert's opinions on each of these elements, the plaintiff is not required to present evidence in the report as if it were actually litigating the merits at this preliminary stage of the lawsuit. *Id.* at 879. In addition, the expert report is not required to prove the defendant's liability. *Kelly v. Rendon*, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Indeed, the expert reports "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support." *Id.* at 679.

The goal of the statute's expert report requirement is to deter frivolous claims. *Scoresby*, 346 S.W.3d at 556. An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable. *Id.* As a result, the Texas Supreme

6

Court recently determined that a minimal standard should be applied when deciding whether to grant a plaintiff a thirty-day extension to cure any deficiencies in a timely filed expert report. *Id.* at 557. The court went on to hold that "a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Id.*

## II. Dr. Psyk

We turn first to Dr. Psyk's contentions on appeal.

### A. Dr. Murphy's Qualifications

In his first issue, Dr. Psyk argues Dr. Murphy is not qualified to render an expert opinion against him because Dr. Murphy is a cardiologist while, according to Dr. Psyk, the area of medicine relevant to appellee's claim is emergency medicine. In essence, Dr. Psyk argues that a medical expert preparing a Chapter 74 report must practice in the same medical specialty as the defendant physician. We rejected this contention in *Kelly*. *See Kelly*, 255 S.W.3d at 672–74 (stating that the Medical Liability Act does not require that a medical expert practice in the exact same field as the defendant). Instead, a physician may testify regarding the standard of care for physicians engaged in another specialty if he is actively practicing medicine in rendering medical care services relevant to the claim. Tex. Civ. Prac. & Rem. Code Ann. § 74.401(c)(2); *Kelly*, 255 S.W.3d at 672–74. Here, the relevant medical services involve the assessment and treatment of a patient suffering from cardiac distress, specifically, a myocardial infarction. Accordingly, we examine Dr. Murphy's report and curriculum vitae to determine whether he was practicing medicine in a field relevant to the claims at issue here.

These documents reveal, in part, that Dr. Murphy (1) is a medical doctor licensed to practice in both California and New Mexico; (2) specializes in the practice of cardiology and regularly examines and treats patients presenting with cardiac issues, including ST

7

elevation myocardial infarction, non-ST elevated myocardial infarction, and unstable angina; (3) is board certified in internal medicine with a cardiovascular subspecialty; (4) is regularly called to activate the STEMI protocol and catheterize patients with cardiac complaints and illnesses similar to those experienced by appellee on April 4, 2009; (5) is experienced in responding to Code Blues called on patients suffering from cardiac arrests and myocardial infarctions; (6) is experienced in activating and performing the STEMI protocol; (7) is experienced in catheterizing patients in all departments of hospitals who are suffering myocardial infarctions; (8) supervises and consults with hospital emergency room physicians and nurses handling patients with cardiac distress and those needing catheterization; (9) is familiar with the accepted and expected standards of care for physicians, nurses, and staff who work in a hospital setting, including emergency rooms, operating rooms, and intensive care units, treating patients presenting conditions the same or similar to appellee; (10) is a Clinical Professor of Medicine at the UCLA School of Medicine; (11) has published numerous peer-reviewed articles, book chapters, and abstracts on the assessment of patients experiencing acute ischemic syndromes as well as the care of patients suffering from myocardial infarctions and other heart diseases. We hold Dr. Murphy is qualified to render an expert opinion on Dr. Psyk's handling of appellee's treatment.

We also reject Dr. Psyk's challenge to Dr. Murphy's qualifications based on his contention Dr. Murphy's rendition of his qualifications is conclusory. To the contrary, Dr. Murphy's report and curriculum vitae provide detailed information summarizing how his education, training, and thirty-plus years practicing as a cardiologist have prepared him to render an expert opinion in this case.[6] *See Burrell*, 230 S.W.3d at 759 (rejecting

---

[6] In addition to the information already discussed above, in his report, Dr. Murphy states:

I know the accepted standards of care, the breaches and violations of the standards of care, and the causation links between the breaches and violations of the standards of care and the injuries to Paul Joseph on the basis of my education, knowledge, training, and experience, which I acquired through:

8

defendant physician's contention the medical expert's qualifications were conclusory). We overrule Dr. Psyk's first issue.

## B.      Sufficiency of Dr. Murphy's Report

In his second issue, Dr. Psyk contends Dr. Murphy's expert report does not meet the good faith requirements of Chapter 74 in multiple ways. First, Dr. Psyk argues Dr. Murphy's report fails to adequately explain the applicable standard of care and the alleged breaches of those standards because he improperly lumps together physicians of different specialties. Second, Dr. Psyk contends Dr. Murphy's report is inadequate because it uses undefined and impermissibly vague terms to describe the standard of care, the alleged

1)      attending and successfully completing medical school classes and residency, that teach the evaluation, diagnosis, care and treatment of patients with the same, or similar, conditions as Paul Joseph, including patients with cardiac distress and acute ischemic syndrome;

2)      my practical experience assessing, treating and caring for patients with the same, or similar, conditions as Paul Joseph including patients with cardiac distress and acute ischemic syndromes;

3)      discussions with colleagues at yearly conferences, seminars and meetings;

4)      the study of technical works routinely published in text books, journals and literature concerning the evaluation, care and treatment of patients with the same, or similar, conditions as Paul Joseph, including patients with cardiac issues and acute ischemic syndromes;

5)      my routine discussions and consultations with other physicians and cardiac specialists when evaluating and treating patients with cardiac distress and acute ischemic syndrome;

6)      my routine and regular contact with hospital nurses in the ER (Emergency Room), OR (Operating Room) and ICU (Intensive Care Unit), and physicians who take care of patients like Paul Joseph;

7)      my regular contact with nurses in the ER (Emergency Room) and ICU (Intensive Care Unit) of hospitals which care for patients like Paul Joseph who experience cardiac distress and acute ischemic syndromes; and

8)      my experience with supervising nurses and physicians caring for patients requiring cardiac catherization [sic], including patients experiencing substernal chest pain and/or patients with underlying disease processes such as hypertension.

9

breaches, and "the causal relationship between any individual act or omission by Dr. Psyk and the injury in question."

### 1. Use of a Single Standard of Care

Dr. Psyk begins with his assertion that Dr. Murphy's application of a single standard of care and breach to each of the defendants is "clearly beneath the requirements of a good faith effort." In support of his contention, Dr. Psyk cites *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244 (Tex. App.—Corpus Christi 2004, no pet.). In *Taylor*, the Corpus Christi Court of Appeals affirmed the trial court's dismissal of a plaintiff's claims, stating that an expert report may not assert that multiple defendants are all negligent for failing to meet the same standard of care without providing an explanation of how each defendant specifically breached that standard and how that breach caused or contributed to the plaintiff's injury. *Id.* From this statement, Dr. Psyk argues that, as a matter of law, an expert report may not apply a single standard of care to multiple defendants.

Presuming that this court would follow *Taylor*, we conclude that *Taylor* is not on point. While *Taylor* does require that an expert report state a standard of care for each defendant in a healthcare liability suit, nothing in the opinion explicitly forbids applying the same standard of care to multiple physician defendants when, under the facts presented in a particular case, each physician owes the same duty to the patient. *Sanjar v. Turner*, 252 S.W.3d 460, 467 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Here, Dr. Murphy did not simply opine, without supporting facts, that each of the defendant physicians had the same standard of care. Instead, he explained within the four corners of his report that, under the circumstances present in this case, each of the defendant physicians owed the same standard of care to appellee. *See Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("There is nothing inherently impermissible about concluding that different health care providers owed the same standard of care to Sherman and breached that duty in the same way."); *see also In re*

*Boone*, 223 S.W.3d 398, 405 (Tex. App.—Amarillo 2006, orig. proceeding) (distinguishing *Taylor* because the expert's report at issue stated that the same standard of care applied to each defendant physician and provided an explanation for reaching that conclusion). We conclude that Dr. Franklin's report specifically named Dr. Psyk, and then sufficiently explained the standard of care owed by Dr. Psyk and how he breached that standard of care. The fact Dr. Franklin determined that same standard applied to the other defendants does not change that analysis. *See San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 817 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("Although Dr. Hammond's opinion for each defendant is identical, he unquestionably provided an opinion for each hospital. That he held each defendant to the same standard of care, found the same type of breach, and analyzed causation in the same way does not render his opinion inadequate."). We overrule the first part of Dr. Psyk's second issue.

### 2. Dr. Psyk's Vagueness Contentions

In the second part of his second issue, Dr. Psyk alleges Dr. Franklin's report is deficient because it relies on "impermissibly vague terms to describe the standard of care and alleged breach" of that standard of care. In the third section, Dr. Psyk argues Dr. Franklin's report is impermissibly vague when describing the causal connection between the alleged breaches of the standard of care and the harm suffered by appellee. We disagree that Dr. Franklin's report is impermissibly vague.

In setting out the expert's opinions on each of the required statutory elements, the report, to qualify as a good-faith effort to comply with the statute, must only provide enough information to fulfill two purposes: (1) the report must inform the defendants of the specific conduct the plaintiff has called into question; and (2) the report must provide a basis for the trial court to conclude the claims have merit. *Scoresby*, 346 S.W.3d at 556. No particular words or formality are required, but bare conclusions will not suffice. *Id.* Here, Dr. Psyk overlooks the following in Dr. Franklin's report:

The standard of care required Dr. Psyk, Dr. Mesa and Dr. Vijayan to activate the STEMI protocol and take Mr. Joseph to the hospital's cath lab and have his artery opened up with a balloon within ninety (90) minutes of his arrival to the ER. In an emergent situation, the standard of care requires immediate catheterization to maintain blood and oxygen flow to the heart to prevent permanent damage when a patient exhibits multiple symptoms of myocardial infarction, including ST-elevation, substernal chest pain radiating to his left arm and increased cardiac enzymes. In reasonable medical probability, if Dr. Psyk, Dr. Mesa and Dr. Vijayan had activated the STEMI protocol and taken Mr. Joseph to the cath lab within ninety minutes of his arrival at the ER, Mr. Joseph would not have sustained serious and permanent cardiac damage. Because they failed to activate the STEMI protocol and take Mr. Joseph to the cath lab until eight hours later, Mr. Joseph had already sustained substantial and irreversible damage to his heart.

. . .

Dr. Psyk, Dr. Mesa and Dr. Vijayan breached and violated the standard of care when they failed to promptly activate the STEMI protocol and admit Mr. Joseph to the hospital's cath lab when Mr. Joseph's ECGs revealed ST-elevations and his cardiac enzymes were high. In an emergent situation, the standard of care requires activation [of] the STEMI protocol and prompt admission to the cath lab and emergent catheterization within ninety minutes of the patient's arrival to the ER. In reasonable medical probability, because Dr. Psyk, Dr. Mesa and Dr. Vijayan breached and violated the standard of care when they failed to activate the STEMI protocol and take Mr. Joseph to the cath lab, they caused … a prolonged blockage of blood and oxygen flow to Mr. Joseph's heart. If Dr. Psyk, Dr. Mesa and Dr. Vijayan had promptly activated the STEMI protocol and taken Mr. Joseph, a patient presenting with ST-elevation, hypotension, elevated cardiac enzymes and substernal chest pain, to the cath lab, Mr. Joseph would not have required a prolonged hospital course and probable chronic congestive heart failure caused by this unnecessary delay. St. Luke's Sugar Land Hospital was vicariously liable for these breaches of the standard of care by Dr. Psyk, Dr. Mesa and Dr. Vijayan, based on agency, ostensible agency and agency by estoppel.

We conclude Dr. Franklin's report is not impermissibly vague when addressing the standard of care, alleged breaches of that standard, and the causal connection between those breaches and the harm suffered by appellee as it fulfilled both statutory purposes: it informed the defendants of the conduct appellee was calling into question and it provided a

12

basis for the trial court to conclude that appellee's claim has merit. *See San Jacinto Methodist Hosp.*, 256 S.W.3d at 817. We overrule the second and third parts of Dr. Psyk's second issue.

### III.   Dr. Vijayan

Dr. Vijayan raises a single issue in her appeal from the trial court's denial of her motion to dismiss appellee's lawsuit against her. Within that single issue, Dr. Vijayan makes several different arguments. We need only reach one. Dr. Vijayan contends Dr. Murphy's report is impermissibly vague because the only specific references to Dr. Vijayan are outside the ninety-minute window for the STEMI protocol to be activated, which Dr. Murphy states is the standard of care for a patient presenting with the symptoms exhibited by appellee. We agree.

In his report's rendition of the relevant facts, Dr. Murphy's only mention of Dr. Vijayan occurs in a single paragraph detailing events after appellee had arrived at the emergency room, two electrocardiograms had been taken, and an enzyme test had been performed:

> Mr. Joseph continues to complain of chest pain and becomes hypotensive prompting Dr. Psyk to give two 500cc's bolus of normal saline. The case was discussed with Dr. Vijayan/Treistman on call MD and patient subsequently moved to room 204 in the ICU with continued chest pain. At 3:15 a.m., Dr. Vijayan started Dopamine for BP support, and then at 5:30 a.m., 250 cc's saline bolus was given again for blood pressure support. At 5:45 a.m., Dr. Theistman ordered the cath lab activated and Mr. Joseph was taken to the lab and the procedure was begun.

As already mentioned above, Dr. Murphy states that the standard of care required Dr. Psyk, Dr. Mesa, and Dr. Vijayan to activate the STEMI protocol and take appellee to the hospital's cath lab and have his artery opened with a balloon within ninety minutes of his arrival in the emergency room. Based on Dr. Murphy's rendition of the facts, it is unclear whether Dr. Vijayan had become involved in the care and treatment of appellee before that crucial ninety-minute window had closed. Based upon the narration of events

13

contained in Dr. Murphy's report, the discussion with "Dr. Vijayan/Treistman on call MD" occurred at an unspecified time between 12:41 a.m. and 3:15 a.m. Because all required information must be found within the four corners of the expert's report, we hold Dr. Murphy's report is deficient as it relates to Dr. Vijayan. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) ("[T]he report must include the required information within its four corners.").

Having determined Dr. Murphy's report is deficient as to Dr. Vijayan, we turn next to her request that we dismiss appellee's lawsuit with prejudice because, in her view, appellee failed to serve her with the statutorily required expert report. As discussed above, the Texas Supreme Court recently addressed this issue. *See Scoresby*, 346 S.W.3d at 556. In *Scoresby*, the court stated:

> An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable…. We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. We recognize this is a minimal standard, but we think it is necessary if multiple interlocutory appeals are to be avoided, and appropriate to give a claimant an opportunity provided by the Act's thirty-day extension to show that a claim has merit. All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case.

*Id.* at 556–57.

Appellee requested a thirty-day extension pursuant to section 74.351(c). Because the trial court denied Dr. Vijayan's motion to dismiss, the trial court did not reach appellee's request for a thirty-day extension. We hold Dr. Vijayan's conduct is implicated in Dr. Murphy's report and that Dr. Murphy's report contains the opinion of an individual with expertise that the claim against Dr. Vijayan has merit. Therefore, we reject Dr. Vijayan's request that we dismiss appellee's lawsuit. Instead, while we sustain Dr. Vijayan's issue on appeal to the extent it challenges the adequacy of Dr. Murphy's expert

report, we overrule her issue to the extent it asks us to dismiss appellee's lawsuit against her. We reverse the trial court's order and remand to the trial court for further proceedings, including the determination of whether to grant appellee a thirty-day extension to cure the deficiencies in Dr. Murphy's report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *The Univ. of Tex. Med. Branch at Galveston v. Qi*, No. 14-11-00704-CV, 2012 WL 1406466, at *7 (Tex. App.—Houston [14th Dist.] April 24, 2012, no pet. h.).

## IV. St. Luke's Sugar Land Hospital

St. Luke's brings two issues on appeal. In the first issue, St. Luke's argues the trial court abused its discretion when it denied St. Luke's motion to dismiss appellee's claims based on St. Luke's vicarious liability for its non-physician employees. In response, appellee affirmatively stated that the only claims being asserted "against St. Luke's are based on the actions of the co-defendant physicians." Therefore, we need not reach St. Luke's first issue because it is moot. *See Camarena v. Tex. Emp't Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988) (stating that a claim becomes moot if at any stage of the litigation there ceases to be an actual controversy between the parties).

In its second issue, St. Luke's argues the trial court abused its discretion when it denied St. Luke's motion to dismiss appellee's claims based upon vicarious liability for the defendant physicians.[7] We disagree.

"When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008). In challenging the adequacy of Dr. Murphy's report, St. Luke's makes the same arguments raised by Dr. Psyk: a single report addressing each of the defendant doctors is inadequate as a matter of

---

[7] Within its second issue, St. Luke's denies the three defendant doctors are its agents. We do not reach that contention because the issue of whether an expert's opinions are correct is an issue for summary judgment or trial, not a motion to dismiss under Chapter 74. *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 n.2 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

15

law and Dr. Murphy's discussion of the standard of care, breach of that standard of care, and the causal connection between the breaches and appellee's injuries are vague. We have already addressed, and rejected those contentions when dealing with Dr. Psyk's issues on appeal. Because the expert report is adequate as to Dr. Psyk, the expert report requirement is fulfilled as to St. Luke's.[8] *Id.* at 672. We overrule St. Luke's second issue on appeal.

CONCLUSION

We affirm the trial court's denial of Dr. Psyk's and St. Luke's Sugar Land Hospital's motions to dismiss. Because Dr. Murphy's report is deficient as to Dr. Vijayan but the deficiency may be curable, we reverse the trial court's denial of her motion to dismiss and remand to the trial court for consideration of appellee's request for a thirty-day extension of time under section 74.351(c) to cure the deficiency in Dr. Murphy's expert report.


/s/    Margaret Garner Mirabal
Senior Justice


Panel consists of Justices Frost, McCally, and Mirabal.[9]

---

[8] The fact we determined Dr. Murphy's report is deficient as to Dr. Vijayan does not change the result here because an expert report is not required to address each and every act or omission mentioned in the pleadings, so long as at least one liability theory within each cause of action is sufficiently addressed. *Lopez v. Brown*, 356 S.W.3d 599, 604–05 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

[9] Senior Justice Margaret Garner Mirabal sitting by assignment.

16