Omar GONZALEZ, M.D., Dr. Kevin Sandberg, SCCI Hospital-El Paso, Inc., d/b/a Kindred Hospital El Paso, and Highlands Regional Rehab Center, Appellants,

v.

Oscar PADILLA and Cecilia Padilla, Appellees.

No. 08–14–00286–CV

Court of Appeals of Texas, El Paso.

March 2, 2016

H. Keith Myers, Mounce, Green, Myers, Safi & Galatza, El Paso, Michelle E. Robberson, Cooper & Scully, P. C., Dallas, Joseph L. Hood Jr., Windle, Hood, Alley, Norton, Brittain & Jay, LLP, El Paso, Angela Morrow Nickey, Robles, Bracken, Coffman & Hughes, El Paso, for Appellants.

Steve Spurgin, Spurgin Law Firm, El Paso, for Appellees.

Before McClure, C.J., Rodriguez, J., and Larsen, Senior Judge

## OPINION

YVONNE T. RODRIGUEZ, Justice

Appellee Oscar Padilla was struck by a

car while riding his motorcycle in El Paso.[1] The accident left Padilla with a broken leg and a "de-gloved" heel totally devoid of any skin. After being stabilized at the University Medical Center (UMC) trauma ward, Padilla was discharged into the care of Highlands Clinic general practitioner Dr. Kevin Sandberg, who in turn referred Padilla to Dr. Omar Gonzalez, a rehabilitative specialist at SCCI Hospital, doing business as Kindred Hospital. Padilla was scheduled to receive three to four weeks of hyperbaric oxygen treatments to promote healing of the open wound, but Dr. Gonzalez discharged him after five days when Padilla failed to tolerate the treatments well. Neither doctor nor medical facility prescribed or administered antibiotics other than topical creams during the course of treatment, and the evidence is disputed as to what extent either doctor followed up after Padilla began receiving home health care. The open wound on Padilla's de-gloved heel eventually became infected and gangrenous. A month after his motorcycle accident, Padilla returned to UMC, where doctors amputated Padilla's leg below the knee after making attempts to save it. Padilla and his wife Cecilia sued.

The question in this case is whether an expert report certifying merit, in which the Padillas' medical expert alleged that Drs. Sandberg, Gonzalez, and their respective employers breached the standard of care, was sufficient to allow the Padillas to survive a motion to dismiss. We agree with the trial court that the Padillas' expert report was made in good faith and sufficiently demonstrated that the pleaded health care liability claims were not wholly frivolous. As such, we affirm the trial court's denial of the Appellants' motions to strike and dismiss.

1. We take this background information from the petition and the expert report in issue, noting that the factual claims have not yet

## BACKGROUND

As required by the Texas Medical Liability Act, the Padillas timely filed an expert report from Dr. Rathel Linwood "Skip" Nolan, a Mississippi-licensed, board certified infectious disease specialist and professor of medicine at the University of Mississippi Medical Center. In his report, Dr. Nolan stated that he had reviewed Padilla's medical records and understood the course of Padilla's treatment to be as follows.

On September 8, 2011, Padilla was struck on his motorcycle and taken to UMC with a broken leg and a de-gloved heel. At UMC:

> [H]e underwent open reduction external fixation surgery of the compound, comminuted fracture he suffered to his lower right leg. The procedure was a success and a 'halo type' fixation device [was] placed around the leg to hold the bones in place as the fracture healed.

Among other medications, UMC placed Mr. Padilla on IV antibiotics. These antibiotics included Gentamicin and Cefazolin (Ancef).[sic]. Mr. Padilla received multiple doses of IV Gentamicin on September 8 and 9, 2011 and multiple doses of IV Cefazoline on September 9, 12 and 13, 2011. At the time of his transfer from UMC on September 16, 2011, Mr. Padilla was prescribed IV Cefazolin for a 10 day period from September 12, 2011 through September 22,

UMC discharged Padilla into the care of Highlands for follow-up rehabilitative care on September 16, 2011. At that time, he had been treated with daily wound care treatments and twice daily doses of Ancef. Padilla was in "fair" condition, and UMC

been proven. *Tenet Hosps., Ltd. v. Bernal*, 482 S.W.3d 165, 168 n. 1 (Tex.App.–El Paso 2015, no pet. h.).

medical reports indicated that his injured leg showed "obvious evidence of continued blood flow, and there was no obvious necrosis beneath the heel tissue itself."

Highlands' medical records show that Padilla received topical antibiotics, but not oral antibiotics or the IV antibiotics prescribed by UMC. He also received wound care treatment with a "wound vac." On September 28, 2011, twelve days after being admitted to Highlands, Padilla was transferred to Kindred's Triumph facility[2] for additional wound care treatments, including hyperbaric oxygen (HBO) treatments. According to their records, Triumph never administered oral or IV antibiotics. Although originally scheduled for a three to four week course of treatment, Padilla did not tolerate the HBO treatments well. Padilla requested additional treatment, but five days after admission, on October 3, 2011, Triumph discharged Padilla, still with an open wound and still wearing the stabilization device on his leg. Dr. Nolan further stated in his report:

> There is no indication in the Triumph medical records that Triumph timely put in place or implemented a comprehensive treatment plan for Mr. Padilla. The first attempt to do so took place very shortly before Mr. Padilla's release from Triumph. However, due to Mr. Padilla's release, Triumph made no attempt to implement the treatment plan. No effort was made to have him seen by a wound care specialist physicians or plastic surgeon prior to his return to UMC although his wound was high risk for development of an infection.

Padilla received home health care after leaving Triumph. Nine days after his discharge, on October 12, 2011, Padilla's home health care service recommended he seek emergency room treatment for his leg. The emergency room physician at East El Paso Physician's Medical Center diagnosed a "serious infection in the leg and instructed Mr. Padilla to return to UMC for treatment." Padilla returned to UMC, "where efforts were made to save his leg. However, due to the presence of gangrene Mr. Padilla's leg could not be saved and on October 21, 2011, Mr. Padilla's right leg was amputated below the knee."

Dr. Nolan's expert report then contains five sections containing his findings, entitled "Standard of Care," "Breach of the Standard of Care," "Proximate Cause," "Damages Proximately Caused by Breaches of the Applicable Standard of Care in the Treatment of Mr. Padilla," and "Summary." In brief, Dr. Nolan accused Appellants of failing to create a comprehensive treatment plan and failing to follow up. All Appellants objected to the report on various grounds, and requested that the report be struck and the case dismissed with prejudice as a sanction for the Padillas' failure to file a complaint expert report in good faith. After a hearing, the trial court denied Appellants' request for relief. This appeal followed. We have interlocutory jurisdiction. TEX.CIV.PRAC. & REM. CODE ANN. § 51.014(a)(8)(West Supp.2015).

## DISCUSSION

The four Appellants in this case have collectively brought multiple issues before this Court, many with subparts. Appellants also, to a certain extent, incorporate each other's briefs by reference. Their complaints can be broadly grouped into attacks on Dr. Nolan's qualifications and assertions that his report was brought in bad faith and is too vague to give them or the trial court adequate notice of what conduct Padilla specifically contends was

2. The record shows that the parties use Kindred and Triumph interchangeably.

negligent. We agree with Padilla that Appellants have failed to provide any valid grounds for reversing the trial court's decision.

### A.

### *Standard of Review and Applicable Law*

■ We review a trial court's decision to dismiss a case on inadequate expert report grounds for abuse of discretion. *Tenet Hosps., Ltd. v. Barajas*, 451 S.W.3d 535, 539 (Tex.App.–El Paso 2014, no pet.).

A plaintiff who brings a health care liability claim must serve each defendant with "one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted" within 120 days of defendant's original answer. Tex.Civ.Prac. & Rem.Code Ann. § 74.351(a)(West Supp. 2015). The filing of this expert report is procedurally required, and failure to timely file the report will result in dismissal of the claim with prejudice. Tex.Civ.Prac. & Rem.Code Ann. § 74.351(b)(2). Where a timely-filed expert report is deficient, the trial court may grant one thirty-day extension to cure the deficiencies, unless it is objectively shown that the report was not filed in good faith, at which point, dismissal is required. Tex.Civ.Prac. & Rem.Code Ann. § 74.351(c).

■ An expert must meet certain qualifications, discussed at length later in this opinion, in order to render an acceptable report. Tex.Civ.Prac. & Rem.Code Ann. § 74.351(r)(5). "A valid expert report has three elements: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex.2013); *see also* Tex. Civ.Prac. & Rem.Code Ann. § 74.351(r)(6). "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Certified EMS, Inc.*, 392 S.W.3d at 630.

■ "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [statutory] definition of an expert report[.]" Tex.Civ.Prac. & Rem.Code Ann. § 74.351(7). A good-faith effort requires the report to contain sufficient information to (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex.2010)(interpreting predecessor statute); *see also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001).

■ In reviewing the adequacy of an expert report, we bear in mind that in passing the TMLA, "[t]he Legislature's goal was to deter baseless claims, not to block earnest ones." *Certified EMS, Inc.*, 392 S.W.3d at 631; *see also Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011)("The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits.").

### B.

### *Was the Padillas' expert qualified?*

■ As a threshold matter, we address challenges to Dr. Nolan's qualifications brought solely by Appellant Dr. Sandberg in his brief. In Dr. Sandberg's Issue One

(Subpart A), he contends that Dr. Nolan was not qualified to render an expert opinion as to him. We disagree.

At issue here are two sets of expert qualifications set by the Texas Medical Liability Act: those necessary to opine on a physician's standard of care and breach, TEX.CIV.PRAC. & REM.CODE ANN. §§ 74.351(r)(5)(A) & 74.401(a)(West 2011), and those necessary to opine on causation. TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(r)(5)(C).[3] To opine on the standard of care for physicians, an expert must be a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX.CIV.PRAC. & REM.CODE ANN. § 74.401(a).

To opine on causation, a physician must be "otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(r)(5)(C).

■ Dr. Sandberg argues that Dr. Nolan is not qualified to serve as an expert in this case because neither his report nor his CV indicate that he has experience overseeing patients in a rehabilitation facility, and there is nothing to show he can speak to issues that would bear on a physi-

cal medicine or rehabilitation specialist. We note that an expert physician is not required to have experience practicing in a specific kind of facility to render an opinion, so long as his general work experience and knowledge establishes an ability to offer a sufficient opinion on proper practices. *IHS Acquisition No. 131, Inc., v. Crowson,* 351 S.W.3d 368, 372 (Tex.App.–El Paso 2010, no pet.)(physician who had never worked for a nursing home could testify in case against nursing home because relevant experience treating respiratory conditions and knowledge of nursing practices established his qualifications). Likewise, there is no requirement a medical expert be of the same specialty as a defendant. "[A] medical expert from one specialty may be qualified to provide an opinion if he has practical knowledge of what is commonly done by doctors of a different specialty." *Barajas,* 451 S.W.3d at 541. "If the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care." *Id.*

■ "[T]he care and treatment of open wounds and the prevention of infection are subjects common to and equally recognized and developed in all fields of practice, thus any physician familiar with and experienced in the subject may testify as to the standard of care." *Legend Oaks—South San Antonio, L.L.C., v. Molina on Behalf of Estate of Rocamontes,* No. 04–14–00289–CV, 2015 WL 693225, at *4 (Tex. App.–San Antonio Feb. 18, 2015, no pet.)(mem.op.)[Internal quotation marks omitted]; *accord Khan v. Ramsey,* No. 01–12–00169–CV, 2013 WL 1183276, at *6

---

**3.** As explained below, because the hospitals are being sued under agency liability theories, and because neither hospital raises any substantive appellate points stating the Padillas were required to articulate a separate stan-

dard of care as to them, a discussion of the expert qualifications for opining on health care provider standards of care is not at issue here.

(Tex.App.–Houston [1st Dist.] Mar. 21, 2013, no pet.)(mem.op.); *Garza v. Keillor,* 623 S.W.2d 669, 671 (Tex.Civ.App.–Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("[T]he standard of care in the infection process ... is common to and equal in all fields of medical practice"). Thus, Dr. Nolan was qualified to opine as to proper wound care and infection prevention practices as they would apply to Dr. Sandberg, even though Dr. Sandberg is a rehabilitation and physical medicine specialist, and even though Dr. Nolan has never worked in the same type of facilities as Dr. Sandberg.

Dr. Nolan's report and C.V. are beyond sufficient to establish that the trial court did not abuse its discretion in implicitly determining he was qualified. Dr. Nolan received his medical degree from the University of Mississippi in 1982, he is certified as a diplomat in both internal medicine and infectious diseases, he is licensed to practice medicine in Mississippi, is a member of multiple professional organizations, has multiple years of hospital experience, and has served as a professor of medicine. Nothing in the record casts doubt as to Dr. Nolan's ability to provide an opinion in this case.

Dr. Sandberg's Issue One (Subpart A) is overruled.

## C.

### *Formal requirements*

All Appellants challenge various formal aspects of Dr. Nolan's report, complaining generally that he failed to parse out responsibility to each party individually, that he failed to set out the requisite information related to each element of negligence with sufficient specificity, and that the premises underlying his report are demonstrably flawed. We address these issues

in partial reverse order, beginning with the purported evidentiary issue.

### 1.

### Scope of Review

In Dr. Sandberg's Issues One (Subpart C) and Two (adopted by reference into Highlands' brief) and Dr. Gonzalez's Issue A (Subpart One)(adopted by reference into Highlands' and Kindred's briefs), Appellants maintain that in deciding whether Dr. Nolan's expert report is adequate, we may look beyond the four corners of the report and consider extrinsic evidence, or at the very least the actual records he relied on, to determine if his opinion was worthy of credence. They then assert that we should direct dismissal of this case because Padilla's medical records conclusively contravene the main factual premises underlying Dr. Nolan's report. For example, although Dr. Nolan attested that Appellants breached the standard of care by failing to follow up or consult with other doctors, Appellants point to medical report excerpts purportedly showing that Padilla met with two plastic surgeons at Kindred, that he had follow-up appointments scheduled with the plastic surgeons and an orthopedic surgeon, and that wound management was transferred from Dr. Gonzalez to one of the plastic surgeons, thereby absolving him of liability.

In support of their contention that we should consider extrinsic evidence or medical reports, Appellants cite two memorandum opinions from our sister court in Beaumont. *See Baptist Hosps. of Se. Tex. v. Carter,* No. 09–08–067–CV, 2008 WL 2917109, at *5 (Tex.App.–Beaumont July 31, 2008, no pet.)(mem.op.)(taking into account inconsistencies between the expert's factual assumptions and the medical records); *Reddy v. Seale,* No. 09–07–372–CV, 2007 WL 5011608, at *4 n. 1 (Tex.App.–Beaumont Mar. 20, 2008, no

pet.)(mem.op.)(opining that review of medical records does not violate "four corners" rule because doctor's statement that he reviewed the records essentially incorporated them into the report by reference). The Padillas argue that the Beaumont Court of Appeals retreated from its previous four corners approach in *Christus Health Se. Tex. v. Broussard*, 306 S.W.3d 934, 937–38 (Tex.App.–Beaumont 2010, no pet.), in which the Court refused to consider affidavit testimony in which a hospital's custodian of records stated the plaintiff could not have been their patient because no records existed for the plaintiff.

The Beaumont cases regarding consideration of "parole evidence" are inconsistent with this Court's previous approach to scope of review at this stage of litigation. We have previously stated that "[a]s the 'statute focuses' on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.'" *Barajas*, 451 S.W.3d at 540 (*citing Palacios*, 46 S.W.3d at 878). We see no reason to depart from this legal proposition here. There is nothing in the statute suggesting that we may consider an expert's credibility or the data he used at this stage of the litigation. The majority of our sister courts agree with us, expressly stating that "[a]n attack of the data underlying an expert's opinion is beyond the scope of a section 74.351 challenge[,]" *Peterson Reg'l Med. Ctr. v. O'Connell*, 387 S.W.3d 889, 896 (Tex.App–San Antonio 2012, pet. denied), and that it is improper to consider the "quality of the evidence the experts used as the basis for their factual assumptions." *Quinones v. Pin*, 298 S.W.3d 806, 813 (Tex.App.–Dallas 2009, no pet.); *see also Pisharodi v. Saldana*, No. 13–09–00552–CV, 2011 WL 319810, at *3 (Tex.App.–Corpus Christi Jan. 27, 2011, pet. denied)(mem.op.); *Gannon v. Wyche*, 321 S.W.3d 881, 891 n. 5 (Tex.App.–Houston [14th Dist.] 2010, pet. de-

nied); *Mettauer v. Noble*, 326 S.W.3d 685, 690–92 (Tex.App.–Houston [1st Dist.] 2010, no pet.); *Collini v. Pustejovsky*, 280 S.W.3d 456, 462 n. 4 (Tex.App.–Fort Worth 2009, no pet.); *Kincaid v. Austin Ctr. for Outpatient Surgery, L.P.*, No. 03–04–00824–CV, 2005 WL 2978602, at *5 (Tex.App.–Austin Nov. 4, 2005, no. pet)(mem.op.).

Appellants' points on apparent conflicts between the medical records and the assumptions Dr. Nolan makes are well-taken. But "[w]hether an expert's opinions are correct is an issue for summary judgment, not a motion to dismiss under Chapter 74." *Tenet Hospitals, Ltd. v. Boada*, 304 S.W.3d 528, 542 (Tex.App.–El Paso 2009, pet. denied). Indeed, Dr. Nolan's report acknowledges that Triumph made a "first attempt" to formulate a treatment plan, but that it abandoned that treatment plan and failed to follow up once Padilla was discharged. Far from conclusively showing that Dr. Nolan relied on incorrect medical records in bad faith, all Appellants arguments do is raise fact issues about the significance of their actions. These type of fact issues are ripe for resolution at summary judgment or trial, but not at this nascent stage of litigation. Inserting fact questions into the calculus at this stage of litigation would have the practical effect of shoehorning summary judgment practice into what is essentially a pleadings dispute. *Id.*

In showing restraint as to scope of review, we mirror the moves of the Texas Supreme Court, which post-*Palacios* has declined to expand the scope of review to consider anything outside the scope of the four corners of the expert report. *See Horizon/CMS Healthcare Corp., Inc. v. Fischer*, 111 S.W.3d 67, 68 (Tex.2003). We also share the broader concerns of now-Chief Justice Nathan Hecht:

Principal among the Legislature's stated purposes in enacting the Medical Liability Act was decreasing the cost of health care liability claims without unduly restricting a claimant's rights. But disagreements over the Act's expert report requirement, which is merely intended to weed out frivolous claims early on, have resulted in protracted pretrial proceedings and multiple interlocutory appeals, threatening to defeat the Act's purpose by increasing costs and delay that do nothing to advance claim resolution. [Footnotes omitted].

*Loaisiga v. Cerda,* 379 S.W.3d 248, 263–64 (Tex.2012)(Hecht, J., concurring in part, dissenting in part).

Adding an additional stage for the parties to argue about fact questions apart from summary judgment and trial would subvert the balance the Legislature struck between protecting doctors from the financial burden of defending against facially meritless allegations, and allowing an injured patient to pursue a colorable malpractice claim without having to marshal their proof three times before recovering damages. *Id.* We also question the wisdom of endorsing an expanded, extra-statutory scope of appellate review of expert report sufficiency given that a plaintiff is largely barred from conducting discovery until the expert report is deemed statutorily sufficient. *See* TEX.CIV.PRAC. & REM. CODE ANN. § 74.351(s)(setting out discovery restrictions); *In re Lumsden,* 291 S.W.3d 456, 462 (Tex.App.–Houston [14th Dist.] 2009, orig. proceeding)(restraining a plaintiff from orally deposing defendants prior to export report sufficient adjudication); *In re Raja,* 216 S.W.3d 404, 409 (Tex.App.–Eastland 2006, orig. proceeding)(same). This would allow the defense a tactical advantage over plaintiffs by letting health care providers and physicians to use statements in medical records to contravene an expert report without providing patients with a reciprocal opportunity to test the validity of those statements through deposition. Again, these sort of factual questions are outside the scope of what the Legislature intended in passing medical malpractice reform.

▇▇▇ In short, we will not open the door to more litigation absent further legislative directive. Precedent dictates that we look only to the text of the report to determine its adequacy, and expanded factual review in the expert report stage is inconsistent with the plain language of the statute and with the stated intent of the Legislature to reduce costs and simplify procedures.[4] Any change to the status quo on this issue must come from the legislative branch of government, not this one.

Dr. Sandberg's Issues One (Subpart C) and Two and Dr. Gonzalez's Issue A (Subpart One) and those portions of Highlands' Issue One and Kindred's Issue One incorporating those arguments by reference are overruled.

### 2.

### Standard of Care and Breach

Having established that we must only look to the four corners of the expert report in assessing sufficiency, we next turn to Appellants' complaints that various aspects of Dr. Nolan's report are inadequate or conclusory.

### *i.*

### *Proper Parties*

▇▇▇ In Issues Two and Three of its brief, Kindred claims that Dr. Nolan's ex-

---

4. Because we hold that review of the medical records is impermissible at this stage of litigation, we need not address any arguments related to the propriety of or preservation issues associated with Appellants' proffer of evidence.

pert report was not made in good faith as to Kindred because the report was limited only to the issue of Dr. Gonzalez's negligence, and it did not encompass the possible alleged negligence of other Kindred agents. The briefing on this issue is unclear, but we need not address this issue at length. Kindred acknowledged in its brief that its defenses against liability ultimately rise and fall in tandem with those of Dr. Gonzalez under either pleaded theory of agent liability. "When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–71 (Tex.2008). So long as the report satisfies the requirements as to at least one theory, the plaintiff is entitled to proceed with his claim against the physician or health care provider. *Certified EMS, Inc.*, 392 S.W.3d at 630. Thus, if Dr. Nolan's report is sufficient as to Dr. Gonzalez, Kindred is implicated as well.

■ Even if this were not the case, we find that Dr. Nolan sufficiently implicated Kindred by specifying that all references he made to Dr. Gonzalez in his report also referred to Kindred. This incorporation by reference is sufficient to bring Kindred within the scope of parties encompassed by Dr. Nolan's report. *See In re Stacy K. Boone, P.A.*, 223 S.W.3d 398, 405 (Tex. App.–Amarillo 2006, orig. proceeding).

Kindred's Issues Two and Three are overruled.

### ii.

### Applying a Collective Standard of Care to All Parties

■ All Appellants[5] assert that Dr. Nolan's failure to articulate separate stan-

dards of care as to each physician is fatal to the Padillas' case under these circumstances. We disagree.

■ "When a plaintiff sues more than one physician, the expert report, in order to constitute a good faith effort, must set forth the standard of care applicable to each physician and explain the causal relationship between each physician's individual acts and the injury." *Clapp v. Perez*, 394 S.W.3d 254, 259 (Tex.App.–El Paso 2012, no pet.). This does not preclude an expert from asserting that multiple physicians all owed the plaintiff the same standard of care. *Id.* However, the expert "must explain why, under the particular circumstances, the physicians owed the same standard of care to the plaintiff and breached that duty in the same manner." *Clapp*, 394 S.W.3d at 259.

Appellants cite *Clapp* as proof that Dr. Nolan's assignment of a collective standard of care to both doctors is legally inadequate. *Clapp* is distinguishable. In that case, a woman aspirated during an emergency surgery aimed at correcting complications from a previous gastric bypass and eventually died. *Id.* at 257. Her heirs sued the surgeon and the anesthesiologist who performed the surgery. *Id.* The plaintiffs' expert stated in his report that the standard of care required certain measures be taken, such as the insertion of a nasal-gastric tube, in order to prevent aspiration, but the report never made clear whether that standard applied to the surgeon, the anesthesiologist, or both. *Id.* at 259–60. Because the report never made clear to which physician the standard of care applied, because the report never delineated why two doctors with different roles in the surgery owed the same standard of care, and because it was unclear

---

5. Dr. Sandberg's Issue One (Subpart E), Dr. Gonzalez's Issue C, Highlands' Issue One (in part), and Kindred's Issue One incorporating other brief's arguments by references.

whose responsibility it was to actually oversee the insertion of the nasal-gastric tube, this Court rejected the expert's report as insufficient. *Id.* at 260–61.

In contrast to *Clapp*, which dealt with the divided responsibilities of two specialist physicians performing separate tasks in the context of a surgical procedure, here, Dr. Nolan's report goes toward the general issue of wound care and infection prevention. As we noted previously, both wound care and infection prevention are subjects common to all fields of medical practice. *Legend Oaks—South San Antonio, L.L.C.*, 2015 WL 693225, at *4. The fact that Dr. Sandberg was a general practitioner and Dr. Gonzalez a rehabilitation specialist did not require Dr. Nolan to specify different standards of care for each of them. Dr. Nolan specifically identifies them both by name repeatedly in making his standard of care and breach findings, and states there is a generally applicable standard of care for doctors looking to prevent infection or for those dealing with patients that have wound care issues. Dr. Nolan makes clear in his report that both physicians owed Padilla the same general duty, which was also the duty Dr. Nolan said he owed his patients presenting the same condition.

Dr. Nolan's grouping of Drs. Sandberg and Gonzalez under the same standard of care meets the requirements we set out in *Clapp* for collectivization. Reversal on that ground would be improper.

Dr. Sandberg's Issue One (Subpart E) and Dr. Gonzalez's Issue C are overruled. Highlands' Issue One and Kindred's Issue One incorporating those arguments by reference are also overruled.

**6.** Dr. Gonzalez's Issue A, Dr. Sandberg's Issue One (Subpart E), Highlands' Issue One,

*iii.*

*Specificity of Standard of Care and Breach Allegations*

■ All Appellants [6] next challenge the specificity of Dr. Nolan's statements with respect to the standard of care and breach, contending that those statements do not constitute a "fair summary" of the applicable standard of care and are vague as to breach. We again disagree.

■ "Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Id.* "Mere reference to general concepts regarding assessment, monitoring, and interventions are insufficient as a matter of law." *Regent Health Care Ctr. of El Paso, L.P. v. Wallace*, 271 S.W.3d 434, 441 (Tex. App.–El Paso 2008, no pet.).

Appellants generally limit their discussion of the standard of care to the bullet point summaries Dr. Nolan made in his report under the section subtitled "Standard of Care," asserting that the following statements, standing alone, are legally insufficient to set out the standard of care and the coordinate breaches (bolding and italics in original):

**STANDARD OF CARE:**
- Mr. Padilla's attending physicians, Dr. Sandberg and Dr. Gonzalez had the final responsibility, legally and otherwise, for Mr. Padilla's care.... During all of these time periods, Mr.

and Kindred's Issue One incorporating those arguments by reference.

Padilla had a large, open, unhealed wound on his heel with a high risk of developing a very serious infection that could result in the loss of his leg.

- The applicable standard of care as to Dr. Sandberg and Dr. Gonzalez in the treatment of Mr. Padilla, as ordinary reasonably prudent attending physicians under similar circumstances, requires that the patient be protected from developing infections, especially under high risk conditions.

- The applicable standard of care as to Dr. Sandberg and Dr. Gonzalez in the treatment of Mr. Padilla, as ordinary reasonably prudent attending physicians under similar circumstances, requires than an adequate and comprehensive plan of care must be established and implemented on a timely basis to meet the patient's anticipated needs, including for the prevention of infection and for the timely diagnosis, and treatment of infection.

- The applicable standard of care as to Dr. Sandberg and Dr. Gonzalez in the treatment of Mr. Padilla, as ordinary reasonably prudent attending physicians under similar circumstances, requires that patients with large, open, unhealed wounds who are at high risk of developing a very serious limb-threatening infection, be closely monitored and followed with urgency.

- The applicable standard of care as to Dr. Sandberg and Dr. Gonzalez in the treatment of Mr. Padilla, as ordinary reasonably prudent attending physicians under similar circumstances, requires that patients with large, open, unhealed wounds who are at high risk of developing a very serious limb-threatening infection,

not be sent home but rather be treated promptly and effectively in an appropriate medical facility, or at a minimum be followed up on very closely and with urgency.

- To facilitate the healing of the degloving injury Mr. Padilla required a comprehensive plan to address said injury including local care and further surgery to close the wound.

### BREACH OF THE STANDARD OF CARE:

Dr. Sandberg and Dr. Gonzalez breached the applicable standard of care in their treatment of Mr. Padilla—a patient with a large, open, unhealed wound at high risk of developing a limb-threatening infection—in numerous ways, including the following:

- Failing to accurately assess Mr. Padilla's condition and address Mr. Padilla's problems and risks;

- Failing to take adequate and reasonable measures to protect Mr. Padilla from developing infection

- Failing to timely establish and implement an adequate and comprehensive plan of care to meet Mr. Padilla's medical needs, including for the prevention of infection and for the timely diagnosis, and treatment of infection;

- Failing to closely monitor Mr. Padilla for infection and follow up on Mr. Padilla's treatment with urgency;

- Failing to refer Mr. Padilla to an appropriate medical facility for prompt and effective treatment of his serious, limb-threatening condition; and

- In the case of Dr. Gonzales [sic] and Triumph, 'dumping' Mr. Padilla from further medical treatment and sending him home rather than assuring that Mr. Padilla received prompt and

effective treatment in an appropriate medical facility.

While Appellants limit their discussion to those bullet points, we cannot similarly limit our review. As with any legal text, in determining whether an expert report sets out the applicable standard of care with sufficient detail, we consider all provisions of the entire document, and not merely the portion contained under a subheading titled "Standard of Care." *See Trisun Healthcare, L.L.C. v. Lopez,* No. 13-13-00238-CV, 2014 WL 3050350, at *3 (Tex.App.–Corpus Christi July 3, 2014, no pet.)(mem.op.)(taking into consideration statements not contained under a subheading labeled "Standards of Care" in determining whether expert report actually set out the standard of care with sufficient detail). This approach is both consistent with the way we interpret other legal documents and texts, and comports with repeated high court instructions that an expert need only provide a "fair summary" of his conclusions, that the report may be "informal," and that the report need not require the level of stringency needed at the summary judgment stage. Bearing in mind that Dr. Nolan's inclusion of a "Standard of Care" subsection of his report does not lock this Court into considering only that section of the report in our analysis, we proceed.

Assuming without deciding that the bullet point summaries standing alone are legally inadequate, other portions of the report provide a gloss on Dr. Nolan's conclusions and illuminate the reader as to what he meant in the summary section. For example, Dr. Nolan states:

Without such a skin covering it is likely that the underlying tissue will become infected if measures are not taken. These measures consist of formulating a plan on how to manage the exposed tissue to prevent infection and how to facilitate the ultimate covering of the exposed area with skin. This is often accomplished by skin grafting. Such a plan is formulated by a plastic surgeon or a physician specializing in wound care. *The standard of care required his physicians at Highlands to involve such a specialist in Mr. Padilla's care to formulate a plan and follow Mr. Padilla's progress to assure the plan was succeeding. This did not occur.* [Emphasis added].

In our review of case law regarding specificity and what constitutes a "fair summary" of the standard of care, we have found wide variation as to what is considered adequate. Some cases require a great deal of detail; others do not. Beyond admonitions that the experts provide a summary that is "fair," "informal," and not as stringent as that required for summary judgment, the appellate courts have not articulate a clear standard, and appear to approach these situations on a case-by-case basis.

We believe the report here is sufficiently detailed as to the standard of care so that the Padillas may proceed with suit for three main reasons. First, again, this case involves the treatment of infection and wounds, which are subjects common to all areas of medicine, and it involves an alleged complete failure to coordinate a treatment plan between doctors. As such, the level of technical detail needed to allow a trial court to determine if a case is frivolous is less than that needed to determine if a suit involving a highly complex procedure like a surgery is frivolous. The *Palacios* standard, properly understood, is flexible, and the level of detail needed to provide a "fair summary" so that the trial judge can determine if a case is frivolous will necessarily vary depending on the context in which an act occurred or the technical knowledge needed to understand and

appreciate the alleged negligent act. *Compare Trisun Healthcare L.L.C.,* 2014 WL 3050350, at *2–*3 (expert's statements that doctor should have issued followup orders for wound care and placed the patient on an air mattress were sufficient) *with Guerrero v. Ruiz,* No. 13–07–00682–CV, 2008 WL 3984167, *3 (Tex.App.–Corpus Christi Aug. 29, 2008, no pet.)(mem.op.)(expert's statement that standard of care required neck surgeon to "preserve" phrenic nerve was insufficient because it did not state how, by means of mechanical segregation or otherwise, the surgeon should have done that) *and Lawton v. Joaquin,* No. 04–13–00613–CV, 2014 WL 783340, *3–*4 (Tex.App.–San Antonio Feb. 26, 2014, pet. denied)(mem.op.)(statements that surgeon should have "preserve a sufficient blood supply to the abdominal wall" were insufficient because they did not describe what surgeon needed to do to ensure continued blood supply).

Second, when the report is read as a whole, the standard of care goes beyond general, conclusory statements that a doctor should "follow up" or "consult" with another physician. *See Regent Health Care,* 271 S.W.3d at 441 (conclusory statements regarding follow-up are inadequate). Dr. Nolan's report makes clear that "implementing a comprehensive care plan" would involve Appellants consulting with plastic surgeons about the possibility of a skin graft or other surgery, or consulting with other wound care specialists. Further, although Dr. Nolan says that Padilla should have been transferred to another "appropriate medical facility" without specifying what that meant, he also opines that the doctors' post-discharge duties to Padilla continued, and that the standard of care required the doctors not to cease their treatment, but to actively monitor the wound, look out for signs of infection, and, in the event infection occurred, decide what course of action would be best. The fact that this case deals with an alleged complete cessation of care, rather than continued care given improperly, weighs heavily in our analysis.

Third, our sister court in Corpus Christi has addressed the sufficiency of an expert report in a wound case care similar to this one, in which the plaintiffs alleged that failure to treat an open wound on the decedent's hand led to amputation. While Appellants have cited numerous examples of expert reports deemed insufficient, those cases have facts that are not as similar to this case as those presented in *Trisun Healthcare, L.L.C. v. Lopez.* In that case, the heirs of a patient who died provided an expert report that, *inter alia,* alleged that a physician's failure to follow up on a patient's open wound and provide adequate care led to the amputation of her hand. *See generally,* 2014 WL 3050350, at *2–*3. The Court there held that a physician's statement regarding follow-up care and wound monitoring were sufficient to appraise the trial court as to the case's non-frivolousness. *Id.* at *3.

*Trisun* bolsters our conclusion that the level of detail Dr. Nolan gave in this case is sufficient to provide Appellants with notice of what the standard of care was. Only Appellant Highlands filed a reply brief, and only Highlands addressed the effect of *Trisun.* In its reply brief, Highlands contends that *Trisun Healthcare* is distinguishable because there, the expert stated that the patient should have received an order for hyperbaric wound treatment, been placed on an air mattress with padding, and repositioned every two hours. *See Trisun Healthcare L.L.C.,* 2014 WL 3050350, at *2–*3. We see no meaningful distinction between the level of detail the expert's conclusions had in that case, and the level of detail present in Dr. Nolan's report. This case is also distinguishable from another premature dis-

charge case Appellants cite, *SJ Med. Ctr., L.L.C. v. Walker,* No. 14–13–00617–CV, 2014 WL 1233457 (Tex.App.–Houston [14th Dist.] Mar. 25, 2014, no pet.)(mem. op.). In that case, the Houston Fourteenth Court of Appeals held that an expert who opined that a nurse should have prevented a doctor from discharging a patient early failed to state exactly how the nurse was supposed to have accomplished that. Here, by contrast, Dr. Nolan identifies the negligence as failing to create and enforce an adequate follow-up plan. *Walker* is inapplicable.

Based on our review of the report, Dr. Nolan's statements as to the standard of care and breach were adequate. We decline to reverse the trial court on that basis.

Dr. Gonzalez's Issue A, Dr. Sandberg's Issue One (Subpart B), and those portions of Kindred's Issue One and Highlands' Issue One incorporating those arguments by reference are overruled.

### 2.

### Proximate Cause

 Finally, we turn to the issue of causation. All Appellants [7] in their briefs contend that Dr. Nolan's conclusions on causation are mere conclusory statements that invite the Court to impermissibly infer a conclusion that Dr. Nolan never actually reaches in his report. We once again disagree.

 "A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred." *Barajas,* 451 S.W.3d at 547. In describing the specificity for causation

conclusions, the Texas Supreme Court has said:

> An expert's conclusion that 'in medical probability' one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit,* which we have consistently criticized.... Instead, the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented. While we have said that no 'magical words' need be used to meet the good-faith requirement, mere invocation of the phrase 'medical probability' is likewise no guarantee that the report will be found adequate.

*Jelinek v. Casas,* 328 S.W.3d 526, 539–40 (Tex.2010).

 Appellants are correct that in reading an expert report for causation, the Court cannot imply or infer a conclusion on causation if the expert never actually articulates one. *Barajas,* 451 S.W.3d at 548. However, in determining whether the expert's causation conclusions are detailed enough, as with standard of care and breach, we read the expert's conclusions on causation in the context of the entire report, not piecemeal or in a vacuum. *Bakhtari v. Estate of Dumas,* 317 S.W.3d 486, 496 (Tex.App.–Dallas 2010, no pet.).

Here, Dr. Nolan's causation assessment is not conclusory. Instead, he analytically links the negligence to the injury step-by-step. He states "[t]he negligent care provided by Dr. Sandberg and Dr. Gonzalez including the failure to timely establish an appropriate treatment plan which provided for infection prevention, resulting in the development and/or progression of the infection." He also states "[t]he aforementioned failures of Dr. Sandberg and Dr.

---

7. Dr. Sandberg's Issue One (Subpart D), Dr. Gonzalez's Issue B; incorporated into High-lands' Issue One and Kindred's Issue One by reference.

Gonzalez to comply with the standards of care caused Mr. Padilla's infection to develop and not receive timely treatment, which inexorably led to the amputation of Mr. Padilla's leg." He then states that "a more aggressive approach to treating Mr. Padilla's condition" would have either prevented the infection, or else kept it from advancing to the extent that it did. Dr. Nolan concludes with a but-for statement: "Based upon a reasonable degree of medical probability, the above-mentioned complications and damages suffered by Mr. Padilla, including the amputation of his leg, were a proximate result of the negligent care provided by Dr. Sandberg and Dr. Gonzalez."

We do not see how Dr. Nolan's causation statements were vague, nor do we find a causal break that would fail to link alleged negligent acts to Padilla's injury. The language at bar is at the same level of specificity as language upheld by our sister courts in other wound care and infection progression cases. *See generally Spitzer v. Berry,* 247 S.W.3d 747, 752 (Tex.App.–Tyler 2008, pet. denied)(infection progression stemming from discontinuation of an-

tibiotics); *Hood v. Kutcher,* No. 01–12–00363–CV, 2012 WL 4465357, at *6–*7 (Tex.App.–Houston [1st Dist.] Sept. 27, 2012, no pet.)(mem.op.)(wound care causation). Dr. Nolan's report is adequate on the issue of causation.

Dr. Gonzalez's Issue B, Dr. Sandberg's Issue One (Subpart D) and those portions of Highlands' Issue One and Kindred's Issue One incorporating those arguments by reference are overruled.

## CONCLUSION

None of Appellants' grounds for reversal are meritorious. We overrule all appellate issues. The judgment of the trial court is affirmed.

Larsen, Senior Judge (Sitting by Assignment)