

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00075-CV

WEATHERFORD TEXAS
HOSPITAL COMPANY, LLC D/B/A
WEATHERFORD REGIONAL
MEDICAL CENTER, PEGGY
GENTZEL, R.N., ALISHA BULLARD,
R.N., AND BONNIE CALHOUN,
R.N.

APPELLANTS

V.

AMY LYNN LAUDERMILT AND
STEVEN MELTON

APPELLEES

----------

## FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 236-285372-16

----------

## MEMORANDUM OPINION[1]

----------

Appellants Peggy Gentzel, R.N., Alisha Bullard, R.N., and Bonnie Calhoun,

R.N. (collectively, the Nurses) and their employer, Weatherford Texas Hospital

---

[1]*See* Tex. R. App. P. 47.4.

Company, LLC d/b/a Weatherford Regional Medical Center (Hospital) appeal from the trial court's denial of their respective motions to dismiss the claims brought against them by Appellees Amy Lynn Laudermilt and Steven Melton, Laudermilt's husband, for failure to file a sufficient expert witness report as required by the Texas Medical Liability Act (the Act). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2017). The Nurses and Hospital argue that the trial court erred by not dismissing the lawsuit because the two expert reports relied on by Laudermilt and Melton were insufficient as to the applicable standard of care, each defendant's breach of that standard of care, and causation. Because we hold that the expert reports were sufficient, we affirm.

## I.    Background

Laudermilt and Melton sued the Nurses and Hospital after several feet of metal guidewire were left inside Laudermilt following a procedure at Hospital. They alleged that the Nurses were negligent in attempting to establish an external jugular or femoral catheterization for Laudermilt, resulting in their losing and permitting the guidewire to remain in Laudermilt, and by not properly accounting for and documenting the use and presence of all medical devices, including the guidewire. The guidewire remained in Laudermilt for nearly two years. After Laudermilt eventually went to a different hospital for ongoing pain in different parts of her body, an X-ray and CT scan revealed that the guidewire had degraded and fragmented, and those fragments had migrated to her head, neck, chest, abdomen, and pelvis. Laudermilt underwent surgery in which doctors

2

removed most of the wire, but some parts could not be removed due to risk of "vein damage and catastrophic hemorrhage." Laudermilt and Melton then brought suit against the Nurses and Hospital based on the Nurses' alleged negligence. They also asserted negligent hiring, training, and supervision claims against Hospital.

Laudermilt and Melton served the Nurses and Hospital with the expert reports of Theresa Posani, MS, RN and Ralph Terpolilli, MD. Each defendant objected that the reports were insufficient as to the standard of care, breach, and causation, and each filed a motion to dismiss. The trial court overruled the objections and denied the motions to dismiss. The Nurses and Hospital now appeal.

## II. Standard of Review

A trial court may grant a motion to dismiss a plaintiff's claims for failure to file a sufficient expert report under the Act if the report does not represent a good-faith effort to comply with the statutory definition of an expert report. *Fagadau v. Wenkstern*, 311 S.W.3d 132, 137 (Tex. App.—Dallas 2010, no pet.). We review a trial court's denial of a motion to dismiss under section 74.351 of the Act for an abuse of discretion. *Otero v. Richardson*, 326 S.W.3d 363, 366 (Tex. App.—Fort Worth 2010, no pet.). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Id.* Merely because a trial court may decide a matter

3

within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.*

## III.    Analysis

### A.    The Standard of Care and the Breach of that Standard

Both the Nurses and Hospital argue that the expert reports provided by Laudermilt and Melton do not adequately set forth a standard of care. Regarding Nurse Posani's report, the Nurses argue that the report makes no attempt to define an identifiable nursing standard of care and makes no attempt to distinguish between the role of each Nurse in Laudermilt's care. As for Dr. Terpolilli's report, the Nurses argue that it improperly attempts to set forth a global emergency medical standard of care applicable to multiple categories of healthcare providers. Hospital makes the same arguments, asserting that Nurse Posani's report does not define an identifiable standard of care for either it or the Nurses. It further argues that Dr. Terpolilli improperly attempts to hold the nursing staff to the same standard of care as the emergency department doctor, that Dr. Terpolilli's statements about the emergency department nursing staff are vague and conclusory generalizations, and that Dr. Terpolilli's report attempts to impose an improper legal standard on Hospital by opining that the emergency department nursing staff had a duty to ensure that informed consent was obtained and appropriately documented.

Regarding their alleged breaches of a standard of care, the Nurses argue that neither report identifies a specific breach of an applicable standard of care by each individual nurse. Likewise, Hospital argues that Nurse Posani's report does not specify a breach for any of the named defendants, that to the extent that it does, it is conclusory, and that Dr. Terpolilli's report does not link the alleged breaches to the harm alleged.

An expert report must "provide a 'fair summary' of the expert's opinions regarding the applicable standards of care, the manner in which the care rendered failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Fagadau*, 311 S.W.3d at 137. "A 'fair summary' of the standard of care is 'something less than a full statement of the applicable standard of care and how it was breached.'" *Id.* at 138 (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)). "A fair summary need only inform the doctor what care was expected but not given." *Id.* "[I]n determining whether an expert report sets out the applicable standard of care with sufficient detail, we consider all provisions of the entire document, and not merely the portion contained under a subheading titled 'Standard of Care.'" *Gonzalez v. Padilla*, 485 S.W.3d 236, 250 (Tex. App.—El Paso 2016, no pet.).

When, as here, a plaintiff sues more than one healthcare provider, the expert report must set out the standard of care applicable as to each provider, but the expert may explain that multiple providers all owed the same standard of

5

care. *See id.* at 247 (holding sufficient an expert report that set forth the same standard of care for multiple physicians); *see also Univ. of Tex. Med. Branch at Galveston v. Kai Hui Qi*, 370 S.W.3d 406, 413 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (stating that the expert report, which addressed the actions of a doctor and a nurse, needed to either describe the respective standards of care for the doctor and the nurse or state that the same standard of care applied to both the doctor and the nurse).

### 1. The Expert Reports Correctly Set Forth the Applicable Standard of Care.

Dr. Terpolilli's report sets out a standard of care for emergency department doctors, a separate standard of care for emergency department nurses, and another standard of care applicable to both emergency department doctors and to emergency department nurses. For emergency department nurses, Dr. Terpolilli states that they were required to perform the following four actions:

One: "Document and notify the treating ED [emergency department] health care providers of significant changes in the patient's clinical condition including changes in vital signs and response to ED treatment interventions."

Two: "Insure that informed consent was obtained and appropriately documented in the ED medical record using the hospital procedure consent form."

Three: "Insure that a procedure time out was performed and documented prior to the performance of an invasive procedure that required informed consent such as [central venous line] placement."

Four: "Document serial nursing observations during and after an invasive ED procedure including [central venous line] placement."

6

Dr. Terpolilli then explains that the Nurses breached these standards by failing to perform and document serial nursing observations of Laudermilt's clinical condition, including her response to various treatments; failing to ensure that informed consent was obtained and documented; failing to insure that a procedure time out was performed and documented prior to the placement of the central venous line; and failing to document serial observations during and after placement of the line.

As for Nurse Posani's report, she agreed with Dr. Terpolilli that the Nurses breached their standard of care by failing to properly document their observations. She states in her report that "the nursing staff failed to appropriately document the care provided to . . . Laudermilt in regards to the attempt to place a central line"; that "[n]o one documented what was done to check placement of the central line placed"; that they failed to "document the collection of data and documentation of care provided [to] . . . Laudermilt"; and that they failed to document any difficulties with the unsuccessful attempt in Laudermilt's chart. She opines that these failures breached the standard of care that required the Nurses to collect "comprehensive data pertinent to the patient's health or the situation." And she further states that "[i]t is difficult to accurately determine the names of all the nurses that cared for [Laudermilt] during the period of time in the emergency department due to the incomplete documentation exhibited in this chart."

The arguments set forth by the Nurses and the Hospital against the expert reports of Dr. Terpolilli and Nurse Posani are without merit.

*First*, the two expert reports sufficiently put the Nurses and Hospital on notice of what care was required but not given. As such, the reports sufficiently set out a standard of care and a breach of that standard. *See Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, 382 S.W.3d 619, 629 (Tex. App.—Fort Worth 2012, no pet.). Although neither report addresses each of the Nurses' failures separately, the reports nevertheless adequately put the Nurses on notice of how each expert believes the Nurses breached their duties. Nurse Posani notes that the Nurses' own failure to comply with the standard for documentation made it difficult for the experts to determine which of the Nurses did what. The Nurses and Hospital frame that difficulty as a flaw in the expert reports, but Nurse Posani and Dr. Terpolilli each give their own label to the difficulty: indication of a breach of the standard of care. Both expert reports note that the Nurses had a duty to make proper documentation and that this documentation was not done. In other words, none of the Nurses complied with this standard.

*Second*, the reports are not as vague and unspecific as the Nurses and Hospital portray them. Indeed, Nurse Posani and Dr. Terpolilli opine about the duties of emergency room nurses in general and with respect to central venous line placement and how those duties were not performed in this case—meaning, they were not performed by *any* of the Nurses. They both name each of the Nurses in their reports and note that the Nurses all treated Laudermilt in the

8

emergency department on the day in question. In other words, *each* of the Nurses had the duties explained in the expert reports, including a duty to monitor and make proper documentation of observations of Laudermilt's care, and *none* of the Nurses complied with that duty. *See Gonzalez*, 485 S.W.3d at 247–48 (stating that an expert may assert that multiple defendant doctors all owed the plaintiff the same standard of care and noting that the expert report named both defendant doctors and stated that there is a generally applicable standard of care for doctors providing the type of care at issue).

*Third*, we disagree that Dr. Terpolilli's report was conclusory as to the breach of the standard of care by the Nurses. The Nurses and Hospital assert as an example of the conclusory nature of his report that while Dr. Terpolilli states that the Nurses had a duty to write down their nursing observations, he did not specify which observations. This argument is unpersuasive; Dr. Terpolilli cannot know what the nurses observed because they failed to document their observations.

*Fourth*, although the Nurses and Hospital contend that Nurse Posani's report was conclusory because she opines that the Nurses breached their standard of care with respect to the unsuccessful attempted placement of the external jugular central venous line, while Dr. Terpolilli discussed the placement of the femoral central venous line, this argument also fails. The differences in the two reports does not make Nurse Posani's report conclusory; rather, taking the reports together, they set out breaches of the applicable standard of care for both

9

attempts at placing a line.  *See Fagadau*, 311 S.W.3d at 138 (holding expert report not conclusory because the expert's opinions were tied to specific facts).

*Finally*, the Nurses and Hospital take issue with Dr. Terpolilli's statements that the Nurses had a duty to ensure that informed consent was obtained and documented and they contend that doctors, not nurses, have such a duty.  But, whether an expert's opinions are correct is not an issue for a motion to dismiss under section 74.351.  *Gonzalez*, 485 S.W.3d at 245.

We therefore hold, based on a review of the expert reports and the applicable law, that the trial court did not act arbitrarily, unreasonably, or without reference to guiding principles by determining that the reports constitute a good-faith effort to explain the bases of the experts' standard of care and breach opinions.  *See Fagadau*, 311 S.W.3d at 137–38.

**B.    Dr. Terpolilli's Report Adequately Addresses Causation.**

Next, Hospital and the Nurses argue that the expert reports do not satisfy the requirements as to causation.  The Nurses argue that Nurse Posani cannot offer causation opinions and that Dr. Terpolilli's report does not constitute a good faith attempt to comply with an expert report as to causation because it fails to link any alleged breach by each nurse to the harm alleged.  Similarly, Hospital contends that Dr. Terpolilli's report fails to explain how any alleged breaches of the standard of care by the Nurses caused the harm alleged.

Hospital and the Nurses are correct that only a physician may opine on causation.  *See Alvarez*, 382 S.W.3d at 627 (citing Tex. Civ. Prac. & Rem. Code

Ann. § 74.351(r)(5)(C)).  But as we explain below, Dr. Terpolilli's report adequately addresses causation.

Dr. Terpolilli ties the breaches of the standard of care he sets out in the report to the result of the doctor leaving the guidewire in Laudermilt.  He explains that "[b]reach of nursing standard [one] directly led to a lack of clinically relevant information being made available to the treating physicians"; that breach of standards two and three "directly led to a failure of the ED nursing staff to organize themselves and prepare their team for the performance of an invasive procedure" by the emergency room physician, which "directly contributed to the failure of [the doctor] to perform Ms. Laudermilt's [central venous line] insertion in a competent and safe manner"; and that breach of standard four "directly contributed to [the doctor's] failure to recognize that he not only lost the guidewire during the performance of [the central venous line] insertion but then left it inside Ms. Laudermilt without activating any clinical resources for retrieval."

Dr. Terpolilli further explains that "[c]loser nursing attention, monitoring, and accountability during [central venous line] placement would have resulted in recognition that the guidewire was missing."  He opines that

> failure of the [emergency department nurses] to keep the treating physicians informed of [Laudermilt's] clinical status, [e]nsure . . . a procedure time out were both performed and documented, and monitor Ms. Laudermilt during an invasive procedure directly contributed to [the doctor's] failure to perform [the central venous line] insertion in a competent manner in which he both lost and left a guidewire inside Ms. Laudermilt thereby causing her subsequent pain, suffering, need for multiple subsequent invasive procedures,

11

and the potential long term medical risks associated with retained non-retrievable vascular and soft tissue foreign bodies.

In other words, Dr. Terpolilli explains that the Nurses breached the standard of care applicable to them because none of the Nurses documented and performed a time out, monitored Laudermilt, or documented her observations, and that these failures contributed to the doctor not recognizing that the guidewire had been left in Laudermilt. Dr. Terpolilli further ties the guidewire remaining in Laudermilt to her injuries. He explains that it "directly resulted in her subsequent pain, suffering, need for multiple subsequent invasive procedures [to remove the wire], and the potential long[-]term medical risks associated with" the fragments of wire that could not be removed.

Dr. Terpolilli does not expressly state that, had the nurses held the time out procedure, monitored Laudermilt, thereby observed that the guidewire had not been removed, and documented their observations that the guidewire remained in place, the doctor would have acted on those observations and removed the guidewire. However, Dr. Terpolilli states that leaving a guidewire inside a patient during a central venous line insertion is a "never event," and Dr. Terpolilli does not need to further spell out his assumption that the doctor, upon having it noted for him that the guidewire remained in Laudermilt, would not have left it there. Dr. Terpolilli was free to infer that the doctor would not have intentionally or knowingly left the guidewire inside Laudermilt. *See Weatherford Tex. Hosp. Co. v. Riley*, No. 02-10-00453-CV, 2011 WL 2518920, at *4 (Tex. App.—Fort Worth

12

June 23, 2011, no pet.) (mem. op.) (holding expert was permitted to infer in expert report that physician would have performed cesarean section had nurses discussed issues with the physician); *see also* Tex. R. Evid. 703 (permitting experts to draw inferences from the facts or data in a case); *Benish v. Grottie*, 281 S.W.3d 184, 195 (Tex. App.—Fort Worth 2009, pet. denied) (noting experts' ability to make inferences from facts).

Because Dr. Terpolilli's report sufficiently connects the Nurses' failures to follow the standard of care to Laudermilt's injuries, the report is sufficient as to causation. And, accordingly, it is sufficient as to Hospital. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (holding that an expert report that satisfies the requirements as to one theory of liability entitles the claimant to proceed with a suit against the physician or healthcare provider, even if it does not address the plaintiff's other theories of liability); *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) (holding that when a plaintiff alleges vicarious liability against a healthcare provider, an expert report that adequately implicates the actions of that provider's agents or employees is sufficient).

Because the expert reports constitute good faith attempts to comply with the requirements for an expert report as to the standard of care, breach, and causation, we overrule Hospital and the Nurses' two issues.

## IV. Conclusion

Having overruled Hospital and the Nurses' two issues, we affirm the trial court's denial of the motions to dismiss.

13

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE


PANEL:  SUDDERTH, C.J.; KERR and PITTMAN, JJ.

DELIVERED:  November 2, 2017