# NO. 12-23-00312-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CORNELIUS BUTLER,* *INDIVIDUALLY AND ON BEHALF* *OF THE ESTATE OF BETTY* *BUTLER,* *APPELLANT* | § | *APPEAL FROM THE 241ST* |
| | § | *JUDICIAL DISTRICT COURT* |
| *V.* | | |
| *TYLER OPS LTC., INC. D/B/A PETAL* *HILL NURSING &* *REHABILITATION,* *APPELLEE* | § | *SMITH COUNTY, TEXAS* |

*MEMORANDUM OPINION*

Cornelius Butler, individually and on behalf of the Estate of Betty Butler, appeals the trial court's order dismissing his healthcare liability lawsuit against Appellee, Tyler OPS LTC., Inc. d/b/a Petal Hill Nursing & Rehabilitation (Tyler OPS). We affirm.

## BACKGROUND

Betty Butler resided at Petal Hill Nursing and Rehabilitation from 2017 to 2020. Tyler OPS managed Petal Hill during part of Betty's stay at the facility. Betty had a history of falls and suffered from Alzheimer's disease, type two diabetes, osteoporosis, osteoarthritis, allergic rhinitis, anemia, chronic gingivitis, hypercalcemia, vitamin deficiency, encephalopathy, cataracts, generalized muscle weakness, hypertension, and "unspecified dementia without behavioral disturbance." On February 28, 2019, Betty "was found to have discolored non-blanching noted with blistering" on her left buttock. In July 2020, Betty was treated at Trinity Mother Frances

Hospital for "sepsis related to UTI and bacteremia." Betty was readmitted to the hospital for respiratory failure, metabolic crisis, and sepsis on September 12, 2020. Upon admission, Betty "was found to have pain of [her] upper right extremity due to ischemia[,]" her fingers were gangrenous, and she had a degloving wound of the right hand. Because of the gangrene in Betty's fingers and her degloving wound, amputation of Betty's right hand was indicated, but severe anemia made her an unsuitable candidate for amputation. Betty was eventually put on a ventilator and placed on hospice. On October 2, 2020, an additional wound was observed on Betty's coccyx, and Betty died that day. Butler filed suit against Tyler OPS for alleged breaches of its duty of care to Betty, which he contended led to Betty contracting COVID-19 and severe pneumonia, as well as suffering from dehydration and developing the hand wound that eventually became gangrenous. According to Butler's petition, an autopsy revealed that Betty "died due to complications of COVID-19 including severe pneumonia."

In an attempt to comply with Chapter 74, Butler served on Tyler OPS an expert report by Dr. F. E. Saba, as well as Saba's curriculum vitae. Tyler OPS objected to the report and moved to dismiss Butler's claim, but the trial court overruled the objections and denied the motion to dismiss. Tyler OPS appealed the trial court's ruling. In that appeal, this Court concluded, among other things, that Saba failed to provide a sufficient causation opinion regarding Betty's hand injury and did not demonstrate that he was qualified to render such an opinion. *Tyler OPS LTC., Inc. v. Butler*, No. 12-22-00188-CV, 2023 WL 1431212, at *4 (Tex. App.—Tyler Jan. 31, 2023, no pet.) (mem. op.). Accordingly, we reversed the trial court's order and remanded the case for the trial court to consider whether to grant Butler a thirty-day extension of time to attempt to cure the deficiencies in the report. *Id*. at *5.

The trial court granted Butler an extension of time to attempt to cure the deficiencies in the report, and in June 2023, Butler served upon Tyler OPS an amended expert report by Saba. Tyler OPS objected to Saba's amended report and moved to dismiss, contending that (1) with respect to Betty's pressure sores, the amended report does not correspond to any pleaded theory of liability, (2) Saba failed to establish that he is qualified to offer a causation opinion concerning Betty's ischemic right hand, and (3) Saba's causation opinions are conclusory and therefore deficient. After conducting a hearing, the trial court sustained Tyler OPS's objections and dismissed Butler's lawsuit with prejudice. This appeal followed.

2

<u>**EXPERT REPORT**</u>

In four issues, Butler contends the trial court abused its discretion by (1) finding that Saba's amended report does not establish that he is qualified to render causation opinions regarding Betty's ischemic hand; (2) determining that Saba's opinions in the amended report regarding Betty's ischemic hand are deficient; (3) finding that Saba's opinions in the amended report regarding Betty's pressure sores are conclusory, do not correspond with "any pleaded liability theory," and do not represent a good faith effort to comply with Chapter 74; and (4) sustaining Tyler OPS's objections to Saba's amended report and dismissing the case with prejudice. Because issue two is dispositive, we address it first.

**<u>Standard of Review</u>**

We review a trial court's ruling on the sufficiency of an expert's report under Chapter 74 for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875, 877 (Tex. 2001). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to guiding rules or principles. *Van Ness*, 461 S.W.3d at 142; *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). In exercising its discretion, the trial court must review the report, sort out its content, resolve any inconsistencies, and decide whether the report demonstrated a good faith effort to show that the plaintiff's claims have merit. *See Van Ness*, 461 S.W.3d at 144. When reviewing factual matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

**<u>Expert Report Requirements</u>**

The Texas Medical Liability Act requires a claimant to serve an expert report on each party against whom he asserts a health care liability claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2023). The purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013). An expert report must fairly summarize the expert's opinions regarding (1) the applicable standards of care, (2) the manner in which the care provided failed to meet the standards of care, and (3) the causal relationship between said failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West Supp. 2023); *Potts*, 392 S.W.3d at 630; *Palacios*, 46 S.W.3d 877.

When determining whether the report constitutes a good faith effort to comply with Chapter 74, the trial court is limited to the four corners of the expert's report and curriculum vitae. *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d at 878; *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Additionally, "[a] court may not fill in missing gaps by drawing inferences or guessing what the expert likely meant or intended, nor may we infer causation." *THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 914, 922 (Tex. App.—El Paso 2016, no pet.). To constitute an objective good faith effort to comply with the requirements of Chapter 74, an expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012); *Palacios*, 46 S.W.3d at 879; *see also* *Tyler OPS*, 2023 WL 1431212, at *2. If, after a hearing, the trial court concludes that the report does not represent an objective good faith effort to satisfy the requirements of Chapter 74, the trial court shall grant a motion challenging the adequacy of the report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West Supp. 2023).

**Causation**

As mentioned above, a valid expert report must fairly summarize the applicable standard of care, explain how a physician or health care provider failed to meet that standard, and establish a causal relationship between the failure and the harm alleged. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Potts*, 392 S.W.3d at 630. "A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute." *Palacios*, 46 S.W.3d at 878. The report need not "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id*. at 879.

A report that merely states the expert's conclusions regarding causation does not provide sufficient information to constitute a good faith effort under Chapter 74. *Id*. In other words, an expert cannot merely opine that a particular breach caused the alleged injury, and a report is deficient if it merely states the expert's conclusions regarding causation. *Jelinek*, 328 S.W.3d at 539; *Garrison Nursing Home and Rehab. Ctr. v. Demings*, No. 12-15-00189-CV, 2016 WL 5118328, at *3 (Tex. App.—Tyler Sept. 21, 2016, no pet.) (mem. op.). An expert must explain the basis for his statements to link his conclusions to the facts. *Jelinek*, 328 S.W.3d at 539. An expert report "must explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Id*. at 539-40. A plaintiff who cannot prove that the defendant's

4

breach of the standard of care proximately caused the injury does not have a meritorious claim. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). The elements of proximate cause are (1) cause in fact and (2) foreseeability. *Id*.; *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). "The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred." *Urena*, 162 S.W.3d at 551. A plaintiff must demonstrate "that it is 'more likely than not' that the ultimate harm or condition resulted from [the defendant's] negligence." *Jelinek*, 328 S.W.3d at 532-33 (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993)).

Although an expert report need not use legal terminology, it must explain, factually, how the claimant will prove that the health care provider proximately caused the injury. *Zamarripa*, 526 S.W.3d at 460. In cases involving a delayed diagnosis, such as the instant case, an expert report must explain how the complained-of harm would not have occurred if the condition were timely diagnosed; that is, the expert report must explain how the claimant will prove proximate cause. *Baylor Coll. of Med. v. Davies*, 599 S.W.3d 323, 328 (Tex. App.—Houston [14th Dist.] 2020, no pet.). When determining whether an expert's conclusions regarding causation are sufficiently detailed, we read the expert's conclusions on causation in the context of the entire report rather than piecemeal or in a vacuum. *Gonzazlez v. Padilla*, 485 S.W.3d 236, 252 (Tex. App.—El Paso 2016, no pet).

Although Saba's amended report addresses a theory of liability related to Betty's pressure sores, because this theory of liability is not pleaded, we do not consider it in our analysis.[1] *See Potts*, 392 S.W.3d at 632 (holding that report that adequately addresses at least one pleaded liability theory satisfies statutory requirement); *Tyler OPS*, 2023 WL 1431212, at *2. With respect to Betty's hand, Saba's report states as follows:

> Early intervention is vital to prevention of degloving and is integral in ensuring that early intervention is available so that the patient has several treatment options available to them. These include treatment through skin grafts, before the injury becomes severe and life threatening and require limb amputation.
>
> . . .

---

[1] Butler did not amend his petition after Tyler OPS's appeal regarding Saba's original report. In our opinion in said appeal, we noted that Butler's petition did not plead a theory of liability related to Betty's pressure sores, and we therefore did not consider that theory in our analysis. *Tyler OPS LTC., Inc. v. Butler*, No. 12-22-00188-CV, 2023 WL 1431212, at *2 (Tex. App.—Tyler Jan. 31, 2023, no pet) (mem. op.). Because said theory of liability remains unpleaded, we do not consider it in this appeal. *See id*.

The standard of care requires that nursing staff perform skin checks daily to monitor progression of wounds and for early detection of infection or necrosis. In the present case, Ms. Butler developed necrosis to her hand. Nursing staff are required to monitor IV sites to ensure that they are patent and that the skin and circulation to the area is not compromised. Nursing staff of Petal Hill failed to do so. On admission to Christus, Ms. Butler was shown to have [a] right hand with no radial and ulnar pulse[,] and the hand was . . . completely black. The standard of care required that nursing staff of Petal Hill assess resident capillary refill. Checking capillary refill is a basic nursing assessment intervention that assesses circulation. Nursing staff of Petal Hill were required to perform capillary refills at least every shift to ensure that Ms. Butler had adequate circulation and tissue perfusion. They failed to do so, as evident in the absence of a radial and ulnar pulse on assessment of the limb when Ms. Butler [was] admitted to the hospital. While it is beyond the scope of practice of nursing staff to diagnose DVT or arterial thrombosis that could cause ischemia and lead to gangrene of the right hand, it is well within nursing practice to perform assessments, including assessment of pulses to the extremity. Additionally, a hand developing blackness and cyanotic nail beds, as identified when Ms. Butler was admitted to Christus, is something that nursing staff could and should have identified and reported to Ms. Butler's physician. They failed to do so. In fact, on 9/12/2020, nursing staff were still simply flushing the IV to Ms. Butler's dorsal hand, without reporting this serious condition to the physician or assessing the area to determine patency, adequate circulation, and skin integrity—actions falling well below the standard of care.

The standard of care required that nursing staff of Petal Hill implement a care plan for Ms. Butler that included ensuring that Ms. Butler receive regular monitoring of wounds or areas of skin breakdown. A care plan for Ms. Butler's care should also have included ensuring there was no restricted blood flow to the area[,] which would be evidenced by cold extremities; in this case, Ms. Butler's right arm. Nursing staff were also required by the standard of care to ensure that Ms. Butler was receiving adequate nutrition and hydration to promote tissue perfusion. Ms. Butler was assessed as requiring 1710 Kcal nutrition and 1710 ml fluid. Nursing staff of Petal Hill were required to ensure that they provided Ms. Butler with food and hydration to increase blood flow as reduced blood flow decreases wound healing. The standard of care was breached in this instance as, while nursing staff of Petal Hill were assessing Ms. Butler's food intake, they failed to ensure that she was consuming at least 1710 ml [of] fluid daily.

The standard of care requires that nursing staff of Petal Hill keep physicians apprised of wound progress so that changes to treatment can be made in response to wound changes. Nursing staff of Petal Hill failed to continually keep Ms. Butler's physician apprised of her care.

The standard of care requires . . . nursing staff of Petal Hill to monitor for signs and symptoms of developing conditions. In this case, Ms. Butler was found to have anemia and hemoglobin of 6.8 g/dL. Ms. Butler would have displayed symptoms such as fatigue, weakness[,] and pallor. These symptoms would not have a sudden onset but would be gradual onset symptoms. The standard of care would require that nursing staff of Petal Hill monitor these symptoms and report changes in condition to Ms. Butler's physician.

The above breaches led to Ms. Butler developing a necrotic wound to her hand[,] which was a contributing factor to her death.

. . .

[C]orporate entities are tasked with formulating policies and procedures for nursing staff to follow and ensuring that nursing staff are providing care to residents in terms of the standard of care. They are also responsible for the actions taken by nurses in the facility in implementing or failing to implement interventions as set out by policies and general nursing standards.

The care and treatment rendered to Ms. Butler by the Tyler Ops LTD, Inc. d/b/a Petal Hill Nursing and Rehabilitation nursing staff fell short in the following ways: . . . They failed to monitor and assess Ms. Butler's right hand where she was receiving [an] IV. . . . Their above listed failures led

to Ms. Butler's increased debility and increased her likelihood for necrosis which contributed to her death.

Causation:

It is my opinion that the events and failures set forth in this report proximately caused Ms. Butler's injuries and led to her pain and suffering and contributed to her death.

. . .

Nursing staff of Petal Hill failed to inspect skin daily to Ms. Butler's hand to ensure that there was no developing infection. They failed to ensure skin integrity and failed to assess Ms. Butler's right hand when they were flushing her IV. Nursing staff of Petal Hill failed to assess Ms. Butler for pulses in her hands. Checking for capillary refill is a manner in which nursing staff assess and confirm that Ms. Butler had circulation in her upper extremities. It can be concluded that nursing staff failed to do so as, had they been assessing Ms. Butler's capillary refill, they would have identified that Ms. Butler had slow refill and return of blood flow to the right hand. This would have indicated to Ms. Butler's nursing staff that she was developing ischemia to the limb, which then would and should have alerted nursing staff to report this change in condition to Ms. Butler's physicians, to allow for her to be sent to a higher level of care. Such lack of flow should have been reported to Ms. Butler's physician immediately, especially in light of the fact that Ms. Butler was receiving IV treatment and would have had a PICC line. Gangrene is death of tissue due to lack of blood flow. Nursing staff of Petal Hill failed to monitor the blood flow of Ms. Butler's arm through conducting of daily skin assessments. Gangrene and ischemia would not have developed rapidly. The lack of performing daily skin assessments allowed for nursing staff to overlook developing change[d] skin condition, which nursing staff could and should have identified. As such, nursing staff failed to recognize ischemia developing when they could and should have recognized this and reported it to Ms. Butler's physician in order for her to be sent to a higher level of care. Ms. Butler developed gangrene to the right hand which went unchecked. This infection led to a decrease in Ms. Butler'[s] immunity, and resulted in chronic inflammation, making Ms. Butler more susceptible to illness and decreasing her ability to recover from infectious disease. It also led Ms. Butler to become deconditioned and contributed to her death.

Due to Defendant's failure to implement adequate care plans, failure to implement interventions set out, failure to ensure that Ms. Butler was being turned and repositioned every two hours at minimum, and failure to monitor and assess Ms. Butler's right hand where she was receiving IV despite signs of gangrene, Ms. Butler developed pressure wounds to the left buttock as well as necrosis to the right hand. The failures of nursing staff at Petal Hill led to Ms. Butler enduring pain, suffering[,] and increased debility that decreased her ability to recover from illness and contributed to her death.

According to Saba's amended report, Betty's cause of death "included necrotic right hand and arm with skin slough."

Butler argues that Saba's amended report is sufficient as to causation because Saba explained that if nursing staff properly assessed Betty's capillary refill, they would have realized she was developing ischemia, which would have allowed Betty "to be sent to a higher level of care." In addition, Butler points to Saba's statements that the nursing staff's failure to properly assess Betty led to her developing gangrene, which decreased her immunity, caused chronic inflammation, made her more susceptible to illness, decreased her ability to recover from infectious disease, and led her "to become deconditioned and contributed to her death." In

response, Tyler OPS notes that in cases involving delayed diagnosis or treatment, the expert must explain the treatment that would have been successfully provided absent the delay. We agree with Tyler OPS.

In his amended report, Saba opines that Betty could have been sent to a higher level of care, but Saba neither explains what treatments were available at a higher level of care nor asserts that any such treatments would have been effective in preventing Betty's injury or death. Saba's causation opinions in his amended report suffer from the same deficiencies as his original report; that is, the amended report does not explain how or why (1) the nursing staff's failure to notice and report the developing ischemia caused Betty's hand injury or (2) the hand injury would have been prevented if nursing staff had more promptly identified the developing ischemia and transferred Betty to a higher level of care. *See Zamarripa*, 526 S.W.3d at 460 (holding that without factual explanations, report is "nothing more than the *ipse dixit* of the experts," which is "clearly insufficient"); *Tyler OPS*, 2023 WL 1431212, at *3. Additionally, although Saba's report mentions skin grafts as a treatment for degloving, he does not state that such a treatment would have been available or effective for Betty. *See Tyler OPS*, 2023 WL 12431212, at *3. Saba's amended report fails to identify any treatment that would have been successful if Betty had been transferred to a higher level of care sooner. *See id.* Moreover, Saba's amended report provides no basis for the trial court to conclude that Betty's injury and death were not due to the natural course of her underlying medical condition. *See Zamarripa*, 526 S.W.3d at 460; *Jelinek*, 328 S.W.3d at 539-40; *Tyler OPS*, 2023 WL 1431212, at *3.

Because the only pleaded liability theory addressed in Saba's amended report concerns Betty's hand injury, and Saba's amended report did not explain how earlier diagnosis could have prevented Betty's hand injury or what effective treatments would have been available, Saba's amended report is conclusory as to causation and therefore deficient. *See Wright*, 79 S.W.3d at 53 (holding that report which lacked information linking expert's conclusion that patient's outcome would have been better to health care provider's alleged failure to correctly interpret x-rays was conclusory); *Palacios*, 46 S.W.3d at 879-80; *Davies*, 599 S.W.3d at 328; *Tyler OPS*, 2023 WL 12431212, at *3; *Demings*, 2016 WL 5118328, at *3. Accordingly, we conclude that the trial court did not abuse its discretion by sustaining Tyler OPS's objections and dismissing Butler's case. *See Zamarripa*, 526 S.W.3d at 460-61; *Jelinek*, 328 S.W.3d at 539-40 (stating that Section 74.351(a) requires report to explain "how and why the breach caused the injury based on

8

the facts presented."). We overrule issue two and need not address Butler's remaining issues. *See* TEX. R. APP. P. 47.1.

## DISPOSITION

Having concluded that the trial court did not abuse its discretion by finding Saba's amended report deficient regarding causation, we ***affirm*** the trial court's order sustaining Tyler OPS's objections and dismissing Butler's healthcare liability lawsuit against Tyler OPS.

**GREG NEELEY**
Justice

Opinion delivered July 24, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 24, 2024**

**NO. 12-23-00312-CV**

**CORNELIUS BUTLER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BETTY BUTLER,**
Appellant
V.
**TYLER OPS LTC., INC. D/B/A PETAL HILL NURSING & REHABILITATION,**
Appellee

Appeal from the 241st District Court
of Smith County, Texas (Tr.Ct.No. 21-1988-C)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellant, **CORNELIUS BUTLER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BETTY BUTLER**, for which execution may issue, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*